58 P.3d 608

ASSOCIATION OF APARTMENT OWNERS OF WAILEA ELUA, Plaintiff–Appellee,

v.

WAILEA RESORT COMPANY, LTD., a Hawai'i corporation, Defendant–Appellee,

and

County of Maui, Defendant–Appellant,

and

Wailea Development Company, a Joint Venture, John Does 1–10, Jane Does 1–10, Doe Corporations 1–10, Doe Partnerships 1–10, Doe Entities 1–10, and Doe Governmental Units 1–10, Defendants.

Association of Apartment Owners of Wailea Elua, Plaintiff–Appellee,

v.

Wailea Resort Company, Ltd., a Hawai'i corporation, Defendant–Appellant,

and

County of Maui, Defendant–Appellee,

and

Wailea Development Company, a Joint Venture, John Does 1–10, Jane Does 1–10, Doe Corporations 1–10, Doe Partnerships 1–10, Doe Entities 1–10, and Doe Governmental Units 1–10, Defendants.

No. 22412.

Supreme Court of Hawai'i.

Nov. 29, 2002.

Kelly A. Cairns, Deputy Corporation Counsel, on the briefs, for defendant-appellant/appellee County of Maui.

Michael D. Tom and Lyle M. Ishida, Honolulu, (of Tom & Petrus), on the briefs, for defendant-appellee/appellant Wailea Resort Company, Ltd.

Robert E. Rowland and Matthew V. Pietsch, Kahului, (of Mancini, Rowland & Welch), on the briefs, for plaintiff-appellee Association of Apartment Owners of Wailea Elua.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.; RAMIL, J., concurring separately, with WHOM ACOBA, J., joins.

Opinion of the Court by MOON, C.J.

Defendant-appellant/appellee County of Maui (the County) and defendant-appellee/appellant Wailea Resort Company, Ltd. (WRC) appeal several orders of the Second Circuit Court, the Honorable E. John McConnell presiding, and the circuit court's March 9, 1999 Amended Judgment entered thereon by the Honorable Artemio C. Baxa, in favor of plaintiff-appellee Association of Apartment Owners of Wailea Elua (the Association). The judgment and orders determined that: (1) the County and WRC were the "owner[s]" of drainage easements traversing the common property of Wailea Elua; (2) the County, WRC, and the Association were jointly responsible "for the current and future repair, maintenance and/or replacement" of the drainage systems, in a percentage allocation discussed herein; (3) the County and WRC were liable to the Association for $1,934.49 and $16,644.53 in damages, respectively, incurred to repair a portion of the drainage systems; and (4) WRC was not entitled to costs pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 68 (1972) for a purported offer of judgment it made to the Association prior to trial.

In this appeal, WRC contends that the circuit court erred by: (1) granting the Association's motion for partial summary judgment against WRC, based upon its ruling that WRC owned implied easements in the drainage systems; (2) denying WRC's motion for reconsideration of the partial summary judgment ruling; (3) granting the Association's motion in limine to exclude evidence on the issue of whether drainpipes, which constitute portions of the drainage systems, were common elements of the Wailea Elua property; (4) failing to account for drainage attributable to properties not owned by WRC, or drainage attributable to time periods in which WRC was not an owner of property that contributed water to the drainage systems; and (5) denying WRC's motion for costs pursuant to HRCP Rule 68. The County contends that the circuit court erred by: (1) ruling that the County owned an express easement in the drainage systems; (2) ruling, on an alternative basis, that the County owned implied easements in the drainage system; (3) qualifying Nolan Perreira as an expert in metallurgy; (4) ruling that corrosion in the drainage systems was not caused by chemicals draining from a golf course owned by WRC; (5) allocating responsibility for a portion of the maintenance and repair of the drainage systems to the County, because either (a) Wailea Elua owners should be the sole owners of the drainage systems, or (b) the corrosion was attributable to drainage from WRC's golf course. For the reasons discussed herein, we affirm the circuit court's judgment.

## I. BACKGROUND

### A. Pre–Litigation Events

In the early 1970s, Wailea Development Company, Inc. (WDC) owned and developed the area known as "Wailea Resort" on the island of Maui. On April 18, 1973, WDC

conveyed to the County fee simple title to "Lot 5" of Land Court Application 1804, the property on which Wailea Alanui Drive—a divided, paved, four-lane road that runs roughly parallel to the ocean in a north-south direction through the subject area in this case—is located today. At the time, Lot 5 and the surrounding area was largely undeveloped and the County quit-claimed its interest in an existing unpaved roadway in exchange for the conveyance of Lot 5. In addition to Lot 5, the deed further conveyed to the County

> easements for drainage purposes over, under and across portions of the lots adjoining Lot 5, said easements to be determined and designated after construction of the improvements in Lot 5 has been completed by [WDC], and [WDC] agree[s] to promptly file a petition to designate such easements and to execute Grant of Easement documents in favor of the [County] in such form as shall be mutually agreed upon; provided that [the County] shall execute a document canceling this grant concurrently with the execution of Grant of Easement documents from the [WDC] to [the County].

This deed was accepted the following day by the County through an action of the County's Council Committee of the Whole. The same conveyance and easements were identified in Transfer Certificate of Title (TCT) No. 158106 issued by the Land Court on April 19, 1973, the only distinction being that the easement language in the TCT clearly identifies the "lots adjoining" Lot 5 as property upon which, *inter alia*, the present Wailea Elua condominiums are located. The number and location of the easements that WDC conveyed to the County in conjunction with the road were not identified at the time of the conveyance; instead, the easements were to

be designated after WDC had developed the road.

WDC thereafter built the Wailea Elua condominiums, which are located makai [1] of Wailea Alanui Drive. WDC also subdivided and developed several properties mauka [2] of Wailea Alanui Drive that are located in the general vicinity "above" Wailea Elua. These include the Wailea Blue Golf Course (Golf Course) and the Wailea Fairways Subdivision (Fairways Subdivision). In addition, WDC originally owned properties in the general vicinity mauka of the road, designated as MF–8, MF–12, and MF–13, that were undeveloped as of the commencement of this litigation.

During construction of the area, an eighteen inch culvert was installed that ran under Wailea Alanui Drive from the mauka properties (north culvert). The culvert drains water into a twenty-four inch drainpipe that runs underground through the Wailea Elua property. This twenty-four inch pipe then merges with a fifty-four inch pipe, discussed *infra*, at which point the merged pipes empty onto a grassy swale [3] on the Wailea Elua property near the beach. Further south along Wailea Alanui Drive, two thirty-six inch culverts (south culverts) were installed under the road that empty into a concrete catch basin. From this catch basin, water flows into a fifty-four inch drainpipe that runs underground through the Wailea Elua property, draining generally towards the sea but also eventually turning northerly and merging with the aforementioned twenty-four inch pipe, which then empties onto the grassy swale.

On June 3, 1977, WDC filed its horizontal property regime declarations for Wailea Elua.[4] The declarations stated that WDC

---

1. "Makai" refers to "on the seaside, toward the sea, in the direction of the sea." Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 114, 225 (1986).

2. "Mauka" refers to "[i]nland, upland, towards the mountain[.]" *Hawaiian Dictionary* at 242, 365.

3. A "swale" is "a low place in a tract of land, usually moister and often having ranker vegetation than the adjacent higher land." *Random House College Dictionary* 1325 (Rev. Ed.1979).

4. Under the horizontal property regime in place at the time Wailea Elua's declarations were filed and under the present condominium property regime, ownership interest in the discrete condominium apartments, as a general rule, belongs to the individual owner. In addition, appurtenant to each discrete condominium apartment is an ownership interest in the "common property" as defined by the declarations; such common property usually includes the grounds upon which the condominium buildings are located. *See generally* Hawai'i Revised Statutes (HRS) chapter 514;

reserved the right to designate various easements "over, under and across" the Wailea Elua property for "utilities, sanitary and storm sewers," and other similar purposes. On July 1, 1977, WDC filed a petition in the land court designating the location of three easements associated with its conveyance of Wailea Alanui Drive to the County. The petition included a map showing the location of the easements and designating them as Easements 61, 62, and 63. The easements are located within Wailea Elua property. Easement 62 is located adjacent to Wailea Alanui Drive in the area where the north culvert meets the twenty-four inch drainpipe. Easement 63 is located adjacent to the road in the area where the catch basin from the two south culverts drains into the fifty-four inch underground pipe. Finally, Easement 61 is located in the grassy swale area into which the two converged drainage systems empty. WDC's designation was approved by the land court on or about July 8, 1977.

Thereafter, during the late 1970s, WDC offered apartment units at Wailea Elua for sale to individual owners. The original apartment deeds to Wailea Elua owners specifically noted that individual apartments were conveyed subject to Easements 61, 62, and 63, which, as noted, are appurtenant to Wailea Alanui Drive. In addition, the original deeds from WDC to individual Wailea Elua apartment owners excepted and reserved easements unto WDC and its assignees

> for electrical, gas, communications and *other utility facilities and purposes and for sewer, drainage, and water facilities and purposes over, under, along, across and through [Wailea Elua]*, together with the right in its sole discretion to designate such easements by filing a petition in the Land Court of the State of Hawai'i without notice to and/or joinder of the Grantee and to grant to ... [any] appropriate governmental agency or to any public utility or other corporation, without notice to and/or

consent of the Grantee, easements for such purposes over, under, across, along and though [Wailea Elua] under the usual terms and conditions required by the grantee of such easement rights ...; PROVIDED, HOWEVER, that such easement rights must be exercised in such manner as not to unreasonably interfere with the use of [Wailea Elua] by the Grantee, ... and, in connection with the installation, maintenance or repair of any facilities pursuant to any of such easements, the premises shall be promptly restored *by and at the expense of the person owning and exercising such easement rights* to the condition of the premises immediately prior to the exercise thereof.

(Emphases added.)

On January 15, 1989—presumably long after WDC had sold off the Wailea Elua apartments and the Association was formed—WRC purchased from WDC, *inter alia*, the Golf Course and the other mauka properties designated MF–8, MF–12, and MF–13. The deed expressly conveyed all "improvements, rights, easements, privileges and appurtenances" associated with the properties to WRC. We note, however, that WRC does not own the Fairways subdivision. Approximately six years later, on or about February 16, 1995, corrosion damage to the fifty-four inch drainpipe running under the Wailea Elua property caused the pipe, and a portion of Wailea Elua's overlaying main roadway, to collapse. The Association ultimately spent $23,195.36 to repair the damage. According to the Association, it demanded that WRC and the County share the costs of repairing and maintaining the pipe, but both parties refused.

### B. *Summary of Litigation*

On July 24, 1995, the Association filed an amended complaint seeking a declaratory judgment that: (1) WRC was the owner of the twenty-four inch and fifty-four inch

HRS chapter 514A (1993). In the typical scenario, when condominium properties are constructed, the developer initially holds title to the entire grounds and the apartments and then proceeds to convey ownership interests in individual apartments and the common property appurtenant thereto as the units are sold. Under most circumstances, an association is formed after a specified number of units are sold and is authorized to act on behalf of the owners to represent their collective property interests.

drainpipes traversing the Wailea Elua property; (2) the drainpipes were not common elements of the Wailea Elua condominium project; (3) WRC should either remove the pipes or designate an easement for themselves and the County across that portion of the Wailea Elua property occupied by the drainpipes; and (4) WRC, as an owner of the pipes, was responsible for the maintenance and repair of the pipes. The amended complaint also sought damages for repairing the pipe and roadway.

Thereafter, the Association filed a motion for partial summary judgment against WRC and the County, seeking, *inter alia,* a declaration that WRC and the County were "owners" of easements in the drainpipes and were responsible for the repair and maintenance of the pipes. The trial court granted summary judgment with respect to WRC, but denied summary judgment with respect to the County and reserved for trial the following issues: (1) whether the County was the holder of an easement in the pipes; and (2) the apportionment of responsibility for repair and maintenance of the drainpipes. WRC filed a motion for reconsideration of the court's partial summary judgment ruling, which was denied. Further details of the summary judgment proceeding and of the remaining events summarized in the paragraph below are described in the discussion section *infra.*

WRC subsequently made an offer of judgment to the Association, which the Association rejected. Shortly before trial, the trial court granted the Association's motion in limine to exclude evidence that the drainpipes were common elements of Wailea Elua property. Following a bench trial, the court ruled that the County was the owner of express or, alternatively, implied, easements in the location of the drainpipes. The court also ruled that all three parties—the Associa-

tion, WRC, and the County—were responsible for the repair and maintenance of the drainpipes in relative proportion to the percentage of water flowing through the pipes from each of their respective properties, adopting, with some minor modifications, the runoff figures propounded by WRC's drainage expert. Following trial, WRC moved for costs pursuant to HRCP Rule 68, contending that its offer to the Association was greater than the judgment ultimately obtained by the Association. The court denied WRC's motion. Both WRC and the County timely appealed the trial court's March 9, 1999 judgment.[5]

## II. DISCUSSION

In order to facilitate explanation of the issues in this case, we discuss the issues as they arise in the approximate chronological order in which their corresponding facts arose.

### A. The Association's Motion for Partial Summary Judgment

#### 1. Factual Background

As noted earlier, the Association filed a motion for partial summary judgment against WRC and the County, seeking a declaration that: (1) WRC and the County were owners of easements in the twenty-four inch and fifty-four inch drainpipes traversing Wailea Elua; (2) the pipes were not common elements of Wailea Elua; and (3) WRC and the County were liable for their pro rata share of past and future repair and maintenance costs associated with the pipes.

In its motion, the Association first argued that WRC, as the successor to the mauka property owned by WDC, owned implied easements in the drainpipes which were appurtenant to the Golf Course.[6] Relying upon

---

5. The trial court initially entered judgment on December 23, 1997 and WRC timely appealed. However, the appeal was dismissed by this court because the judgment did not comply with the requirements of *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 869 P.2d 1334 (1994). A final judgment which did not differ substantively or in the monetary amount specified was subsequently entered on March 9, 1999.

6. The parties' memoranda referencing WRC's golf course and other mauka properties do not always clearly specify the particular "mauka" properties to which they are referring, and the court's orders and eventual findings and conclusions do not clearly identify which properties owned by WRC have appurtenant easements. However, the only mauka property clearly identified in the chain of title and warranty deed ultimately conveyed to WRC are Lots 304 and

*Henmi Apartments, Inc. v. Sawyer,* 3 Haw. App. 555, 655 P.2d 881 (1982), the Association argued that the intent of the parties to create an implied easement could be discerned from "all of the facts and circumstances" surrounding the conveyance of the Wailea Elua properties to individual owners. Second, the Association contended that the County owned implied easements in the drainpipes because the deed to Wailea Alanui Drive conveyed Easements 61, 62, and 63 to the County, presumably arguing that the deed also implied the existence of easements in the locations of the pipes connecting Easements 61, 62, and 63. Third, the Association contended that, under *Levy v. Kimball,* 50 Haw. 497, 443 P.2d 142 (1968), WRC and the County were liable for the repair and maintenance of the pipes.

In support of its motion, the Association submitted, by affidavit, the following: (1) the chains of title and purchase agreement demonstrating that WDC had conveyed the Golf Course to WRC; (2) an example of an original apartment deed in which WDC conveyed condominium units to initial Wailea Elua owners, and the horizontal property declarations, both of which showed that WDC had conveyed the property subject to Easements 61, 62, and 63 and had reserved, for itself, easements for drainage "under" the Wailea Elua property; and (3) copies of three different drainage and erosion control reports written at various stages of the development and construction of the Wailea Elua property, along with accompanying correspondence between various engineers, WDC representatives, and County officials, purporting to show, presumably, that the drainage plan for Wailea Elua was part of a comprehensive plan for the overall development of the area. Finally, the Association also submitted documentation of the damage and repair costs related to the collapsed pipe and roadway.

In opposition to the Association's motion, WRC did not address WDC's intent at the time it severed the Wailea Elua portion of the property. Instead, WRC argued that: (1) it was never an owner of the Wailea Elua property and was not involved in the designation of any easements over Wailea Elua and, accordingly, was not the successor in interest to WDC; (2) even if it owned implied easements beneath the Association's property, it was not responsible for maintaining the pipes; and (3) the language of the apartment deeds established that the pipes were common elements of Wailea Elua. The County opposed the Association's motion, contending that: (1) it had never accepted an easement over the Wailea Elua property and could not be forced into accepting such easements; and (2) it was not required to obtain an easement over Wailea Elua because "[t]he drain pipes under the surface [of Wailea Elua] are there for the benefit of the [Association.] Were it not for these drain pipes, the water would merely drain down the natural gullies or gulches that existed prior to the creation of an underground drainage system." The County, however, presented no evidence supporting this statement.

The trial court granted the Association's motion for partial summary judgment with respect to WRC, ruling that WRC "is the owner of and holds an implied easement for drainage purposes over, under, across, along and through that portion of the Wailea Elua condominium project which is occupied by the 24″ and 54″ storm drains." The court's primary reasoning appeared to be that

the Hawai'i test [to determine whether an implied easement exists] seems to be really a more general test according [to] the intent of the parties. And given the fact that [WDC] obviously planned this—created the—I'm not sure how to describe it technically—the areas where the water collects, where they granted the express[ ]

310, as specified on Map 34 of Land Court Application No. 1804 of the Matson Navigation Company. According to the purchase agreement filed with the Association's motion for partial summary judgment, these parcels constitute most of the Golf Course. The precise parcel conveyed is lots 304 and 310, identified in a deed filed February 10, 1989, Liber 22849 at pages 234–36 and 245. This is the parcel to which WRC's

implied easement is appurtenant; throughout the remainder of this opinion, this parcel is generally referred to as the Golf Course. The terms "Golf Course" and "mauka properties" should be viewed in the context in which they are used and may, at times, be used interchangeably. Ultimately, however, the implied easement to which we refer is appurtenant only to the above-mentioned Lots 304 and 310.

easement, can there really be any genuine issue of fact but the intent of the parties is that this system benefit the mauka property? I don't see how you can say that any other conclusion could be reached[.]

With respect to the County, the trial court denied the Association's motion, appearing to rule that a genuine issue of fact remained as to whether the County accepted any easements or could be required to accept any easements. The trial court also ruled that the pipes were not common elements of Wailea Elua. The partial summary judgment order was filed March 14, 1996.

Ultimately, following trial, the court entered the following pertinent conclusions of law (COLs):

5. Pursuant to the [c]ourt's Order Granting Plaintiff's Motion for Partial Summary Judgment With Respect to [WRC] ... on March 14, 1996, WRC is an owner of an easement through the Wailea Elua property in the location of and through the 24″ and 54″ drainage systems located under the Wailea Elua property.

6. As owners of easements in and to the 24″ and 54″ drainage systems located under the Wailea Elua property, County and WRC are responsible for their proportionate share of the cost of repairing and maintaining the 24″ and 54″ drainage systems (which systems include the 18″ and two 36″ drainpipes under Wailea Alanui). *Levy v. Kimball,* 50 Haw. 497, 443 P.2d 142 (1968); *Powers v. Grenier Construction Inc.,* 10 Conn.App. 556, 524 A.2d 667 (1987).

## 2. Standard of Review

This court reviews a circuit court's award of summary judgment de novo. *Estate of Doe v. Paul Revere Ins. Group,* 86 Hawai'i 262, 269, 948 P.2d 1103, 1110 (1997).

Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. The evidence must be viewed in the light most favorable to the non-moving party. *State ex rel. Bronster v. Yoshina,* 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citations and internal block quotation format omitted).

## 3. Analysis

WRC presents three arguments in support of its contention that the trial court erred in granting summary judgment for the Association by ruling that WRC "owned" implied easements in the drainpipes and was responsible for its pro rata share of maintaining them. According to WRC, the trial court erred because: (1) WRC does not need implied drainage easements through Wailea Elua inasmuch as WRC is entitled to discharge reasonable amounts of water onto Wailea Elua property; (2) the Association presented insufficient evidence to support its implied easement theory; and (3) even if WRC owned implied easements, it is not legally responsible for maintaining the easements. Neither of the first two arguments were raised at the summary judgment proceeding. We being our discussion by first reviewing the law concerning the genesis of implied easements.

### a. *implied easement theory*

In *Neary v. Martin,* 57 Haw. 577, 561 P.2d 1281 (1977), this court explained the theory of the genesis of an implied easement:

All implications of easements necessarily involve an original unity of ownership of the parcels which later become the dominant and servient parcels. When A owns Blackacre, it is not possible for A as the owner of the west half of Blackacre to have a true easement with respect to the east half of Blackacre; but it is both possible and frequent to find A using the east half of Blackacre for the service of the west half of Blackacre, as for example, when the east half of Blackacre contains drains, or sewers, or irrigation ditches, or roadways or stairways which increase the usability of the west half of Blackacre. It is then possible to describe A's utilization of one

part of Blackacre for the service of another part thereof as a quasi-easement, and to speak of the served part as the quasi-dominant tenement, and of the burdened part as the quasi-servient tenement.

Where such a quasi-easement has existed and the common owner thereafter conveys to another the quasi-dominant tenement, the conveyee is in a position to claim an easement by implication with respect to the unconveyed quasi-servient tenement. *Id.* at 580, 561 P.2d at 1283 (quoting *Tanaka v. Mitsunaga,* 43 Haw. 119, 122–23 (1959) (in turn quoting 3 *Powell on Real Property,* § 411)). In addition to circumstances involving the conveyance of the former quasi-dominant parcel, the owner of the former quasi-dominant parcel, as the grantor, may also retain an implied easement over the former quasi-servient parcel if the former *quasi-servient* parcel is conveyed. *See Neary,* 57 Haw. at 580–81, 561 P.2d at 1284. In the instant case, WDC was the common owner of the mauka properties and Wailea Elua when WDC severed that ownership by selling individual condominium properties to Wailea Elua owners beginning at some point in the late 1970s. Because the issue in this case

concerns whether WDC retained an implied easement to serve its mauka Golf Course over the property it conveyed to Wailea Elua owners, the Golf Course is the former quasi-dominant parcel and the Wailea Elua property is the former quasi-servient parcel.[7]

■ The primary factor in determining whether WDC, as the grantor, retained an implied easement over Wailea Elua in favor of its mauka properties, is the parties' intent at the time WDC severed the parcels. *See Neary,* 57 Haw. at 581–82, 561 P.2d at 1284; *see also Tanaka,* 43 Haw. at 123 ("the basis of an implied easement is the presumption of grant arising from the circumstances of the case"); *Henmi Apartments, Inc.* 3 Haw.App. at 559, 655 P.2d at 885 ("Whether an implied easement exists depends on the intent of the parties as shown by all the facts and circumstances under which the conveyance was made."). [8] Determination of the intention of the parties is a question of fact. *See Neary,* 57 Haw. at 582, 561 P.2d at 1284; *Tanaka,* 43 Haw. at 123; *Henmi,* 3 Haw.App. at 559, 655 P.2d at 885.

■ At the summary judgment stage of this case, the only evidence introduced con-

7. Although cases involving implied easements usually involve contiguous parcels, the fact that the Golf Course and Wailea Elua were not contiguous properties at the time WDC severed its common ownership (because the parcels are separated by Wailea Alanui Drive) is not fatal to an implied easement claim. *See Piazza v. Schaefer,* 255 Cal.App.2d 328, 333–34, 63 Cal.Rptr. 246, 250–51 (1967) (implied easement to water rights through pipeline existed despite the fact that parcels were not contiguous).

8. Three factors are often used as a means of indicating intent. It is often said that, in order for a previously existing quasi-easement to ripen into an implied easement, the quasi-easement must have been: (1) apparent; (2) permanent; and (3) either (a) "important for the enjoyment of the conveyed quasi-dominant parcel[,]" or (b) "strictly necessary" for the enjoyment of the dominant parcel. *See Neary,* 57 Haw. at 580–81, 561 P.2d at 1283–84. Some courts have shown a greater reluctance to imply an easement where, as here, it is the quasi-servient tenement, rather than the quasi-dominant tenement, that was conveyed. *See id.* at 581, 561 P.2d at 1284. Such reluctance is due to the fact that the grantor who conveys a quasi-servient tenement retains control of the quasi-dominant tenement and is in a better position to have expressly reserved the easement over the quasi-servient tenement in the first

place. In *Neary,* which also involved the conveyance of the purported servient parcel, this court declined to identify whether the purported easement was required to be "strictly necessary," or merely "important," for the enjoyment of the quasi-dominant parcel in order to establish an implied reservation of an easement because other evidence indicated that the grantor's intent was clear at the time of the conveyance. *See id.* at 580, 561 P.2d at 1284. In other words, although the three above-mentioned general "requirements" for the creation of an implied easement will ordinarily constitute the "test" by which courts should ascertain the presence of an implied easement, they are but one method of ascertaining "the presumption of grant arising from the circumstances of the case[,]" *Tanaka,* 43 Haw. at 123, or "the intent of the parties as shown by all the facts and circumstances under which the conveyance was made[,]" *Henmi,* 3 Haw.App. at 559, 655 P.2d at 885.

As in *Neary,* the trial court in this case relied upon other documentary evidence to ascertain the parties' intent at the time WDC severed its common ownership of the mauka properties with Wailea Elua. Thus, we need not determine whether the purported easement is required to be "strictly necessary," or merely "important," for the enjoyment of the quasi-dominant mauka properties.

cerning WDC's intent at the time it severed the properties was evidence demonstrating that it intended to reserve an easement for the Golf Course. First, the documents suggested that WRC believed that it needed to reserve drainage easements for itself under the Wailea Elua property. Second, because the pipes served as receptacles for the water draining from the mauka properties, their location and arrangement suggests that they were intended, in part, to benefit the mauka portions of the common property and impose a servitude upon the Wailea Elua portion of the common property.

WRC, on the other hand, presented no evidence regarding WDC's intent that contradicted the Association's evidence. WRC did not argue that it was not WDC's intent, as the original common owner, to create an implied easement. Instead, WRC argued that it had never owned the Wailea Elua property and was not involved in the designation of easements—an irrelevant argument given that the implied easement at issue was appurtenant to the land. *See generally Peck v. Bailey,* 8 Haw. 658, 661 (King.1867) ("An easement appurtenant to land will pass by a grant of the land, without mention being made of the easement or the appurtenances."). Under these circumstances, the only evidence available to the trial court suggested that WDC installed the drainpipes at least in part to benefit the mauka properties. Given that the mauka drainage included drainage from a golf course, it would not have been incorrect for the trial court to believe that the golf course diverted the natural flow of surface water on the mauka properties and that the drainage system existed in part to collect the altered flow of runoff water. Indeed, this reasoning is supported by the trial court's statement that WDC obviously "created" the "areas where the water collects."

b. *"reasonable discharge" of surface water and sufficiency of evidence in support of an implied easement*

■ Relying primarily upon *Carter v. County of Hawai'i,* 47 Haw. 68, 384 P.2d 308 (1963), and *Rodrigues v. State,* 52 Haw. 156, 472 P.2d 509 (1970), WRC contends that it

does not need a drainage easement because, as an upslope landowner, it is entitled to discharge reasonable amounts of surface runoff water "along the natural course and flow of the terrain" which empties onto the Wailea Elua property. Under the "reasonable use" rule cited by WRC, "each possessor of land may interfere with the natural flow of surface water for the development of his land so long as such interference is not unreasonable under the circumstances of the particular case." *Rodrigues,* 52 Haw. at 164–65, 472 P.2d at 516. WRC's second argument is dependent upon its first argument: because WRC is entitled to discharge reasonable amounts of surface water downslope, the Association has not shown that the pipes are "strictly necessary," *see supra* note 8, for the enjoyment of the golf course. Therefore, according to WRC, the evidence is insufficient to support an implied easement claim. To support these two arguments [hereinafter, collectively, the reasonable use rule], WRC relies upon evidence produced at trial, discussed *infra,* that the upslope water was being drained through the culverts under Wailea Alanui Drive into a natural drainage way on the Wailea Elua portion of the property and was diverted by the drainpipes once it reached the Wailea Elua property in order to build buildings on the natural drainage plain of Wailea Elua. Such evidence suggests that: (1) the purpose of the pipes on the Wailea Elua property was solely to benefit Wailea Elua rather than for the benefit of draining the mauka properties; and (2) the mauka waters may have flowed towards the direction of the natural drainage way on Wailea Elua irrespective of any mauka development.

■ As the Association points out, there are two significant problems with WRC's arguments. First, WRC is raising the "reasonable use" argument for the first time on appeal. Legal issues not raised in the trial court are ordinarily deemed waived on appeal. *See Molinar v. Schweizer,* 95 Hawai'i 331, 339–40, 22 P.3d 978, 986–87 (2001); *Kawamata Farms, Inc. v. United Agri Products,* 86 Hawai'i 214, 248–49, 948 P.2d 1055, 1089–90 (1997); *Mauna Kea Power Co., Inc. v. Board of Land and Natural Resources,* 76 Hawai'i 259, 262, 874 P.2d 1084 n. 2, 76

Hawai'i 259, 874 P.2d 1084, 1087 n. 2 (1994). Second, in order to buttress its legal argument, WRC is relying upon evidence presented *after* the summary judgment proceeding. When reviewing a summary judgment, an appellate court's consideration of the record is limited to those materials that were considered by the trial court in ruling on the motion. *Munoz v. Yuen,* 66 Haw. 603, 605–06, 670 P.2d 825, 827 (1983). Thus, this court will not examine evidence not specifically called to the attention of the trial court. *Id.* at 606, 670 P.2d at 827; *see also Leary v. Poole,* 5 Haw.App. 596, 599, 705 P.2d 62, 65 (1985).

In its reply brief, WRC relies upon *Fujioka v. Kam,* 55 Haw. 7, 514 P.2d 568 (1973), for its contention that, although this court "is limited [in its consideration] to the submissions of *fact* before it at the [summary judgment] motion, it is well-established law that an appellate court may rely upon other *legal* bases in its review of the summary judgment." (Emphases in original.) In other words, WRC—for the first time in its reply brief—cites *Fujioka* for the proposition that, even if this court did not consider subsequently-admitted facts in reviewing the summary judgment ruling, this court may still review the ruling using an alternative legal theory.

In *Fujioka,* the plaintiff was injured when a portion of the roof of a supermarket fell on her; she sued the owners of the building, who in turn filed a third-party complaint against the engineer and contractor who had designed and constructed the building, respectively. *Fujioka,* 55 Haw. at 8, 514 P.2d at 569. The trial court granted summary judgment in favor of the engineer and contractor on the ground that HRS § 657-8 absolved them from liability because their services were rendered more than ten years before the incident. *Id.* at 8–9, 514 P.2d at 569. Considering legal arguments raised by the owners for the first time on appeal, this court agreed that HRS § 657-8 violated the owners' right to equal protection because it treated them differently than the engineer and contractor by exposing the owners, but not the contractor and engineer, to liability. *See id.* at 9–12, 514 P.2d at 569–71. In

deciding to exercise its discretion to consider the owners' argument despite the fact that they had not presented it to the trial court, this court looked to "whether the consideration of the issue requires additional facts[;] whether the resolution of the question will affect the integrity of the findings of fact of the trial court; and whether the question is of great public import." *Id.* at 9, 514 P.2d at 570; Reasoning that the question of the constitutionality of the statute was a purely legal question that did not require additional facts and was "of great public import," this court decided to address the owners' argument. *Id.* at 9–10, 514 P.2d at 570; *see also Bertelmann v. Taas Assocs.,* 69 Haw. 95, 103, 735 P.2d 930, 935 (1987) ("A judgment will not ordinarily be reversed based on a theory an appellant failed to raise at the trial level unless justice so requires. Because the existence of the Survivors' cause of action is of public importance and does not require additional facts, though, we will consider this issue.").

Unlike *Fujioka,* full consideration of the "reasonable use" rule raised by WRC in this appeal will require additional facts, as illustrated by the fact that WRC itself relied on evidence adduced at trial to present its argument on appeal. Moreover, unlike *Fujioka,* the constitutionality of a statute is not at issue in the instant case. Furthermore, WRC does not explain why "justice" requires this court to address a newly-raised issue, and the question whether WRC is the holder of an implied easement in the Wailea Elua property is not of "great public import." For the foregoing reasons, we decline to address WRC's argument, raised for the first time on appeal, that the reasonable use rule implicated by *Carter* and *Rodrigues* is applicable to this case.

c. *responsibility for maintenance of easement*

█ WRC contends that, even if it owns implied easements to drain surface water under Wailea Elua, the trial court erred in ruling that WRC was partly responsible for repairing and maintaining the easements. According to WRC, the trial court erroneously relied upon *Henmi* in its ruling.

WRC is incorrect. The transcript indicates that the trial court relied on *Henmi* primarily for determining the existence of the easements in the first place—not for determining who was responsible for maintaining them. *See supra* at 104, 58 P.3d at 615 ("the Hawai'i test [to determine whether an implied easement exists] seems to be really a more general test according to the intent of the parties"); *Henmi,* 3 Haw.App. at 559, 655 P.2d at 885 ("Whether an implied easement exists depends on the intent of the parties as shown by all the facts and circumstances under which the conveyance was made.").

As COL No. 6 clearly indicates, the trial court's determination that WRC was responsible for sharing maintenance costs of the pipes was based upon *Levy v. Kimball,* 50 Haw. 497, 443 P.2d 142 (1968), and *Powers v. Grenier Construction Inc.,* 10 Conn.App. 556, 524 A.2d 667 (1987). *See supra* at 105, 58 P.3d at 616. In *Levy,* the plaintiff fell while walking on the top of a seawall. *Levy,* 50 Haw. at 497–98, 443 P.2d at 143. The State of Hawai'i owned an easement over the seawall that had been obtained for the purpose of providing a path for public travel. *Id.* at 498, 443 P.2d at 144. The plaintiff sued the State, alleging that it had negligently maintained the wall. *See id.* In determining that the State had negligently maintained the wall, this court noted that "[i]t is a well established rule that an owner of an easement has the right and the duty to keep it in repair." *Id.* Similarly, in *Powers,* the owner of the dominant estate, which possessed an express and implied drainage easement over the servient estate, was held liable for damages caused by failing to repair the drainage system on the servient estate. *Powers,* 524 A.2d at 668–69.

■ Although *Levy* and *Powers* sound in tort—a circumstance in which one would expect most such cases to arise,—they are consistent with the general equitable principle that the users of an easement have an obligation to help maintain the easement so as not to unreasonably burden the servient estate. According to *Restatement (Third) of Property* [hereinafter, *Restatement*] § 4.13(1) comment b (1998):

> If the servient estate is being used by the servitude owner in common either with holders of other similar servitudes or with the owner of the servient estate, the owner of the servitude does not have an affirmative duty to make repairs, *but does have a duty to contribute to the reasonable costs of repairs or maintenance undertaken by others.*

(Emphasis added.) In this case, the easement is being utilized by both the easement holder (WRC) and the servient (the Association). Accordingly, WRC has a duty to contribute the reasonable costs of repair and maintenance undertaken by the Association. *See also Nixon v. Welch,* 238 Iowa 34, 24 N.W.2d 476, 481 (Iowa 1946) (the owner of an easement in a drainage ditch was responsible for the cost of clearing it); *Rehwalt v. American Falls Reservoir District No. 2,* 97 Idaho 634, 550 P.2d 137, 139 (1976) (the owner of an easement for an irrigation canal and maintenance road had a duty to maintain and repair the easement so as not to create a burden on the servient estate). Thus, the trial court did not err in ruling that WRC was partly responsible for paying for the maintenance and repair of the drainpipes.

Justice Ramil's concurring opinion contends that WRC owns Easements 61, 62, and 63 by express grant. We respectfully disagree. Initially, we note that the parties did not argue before the trial court, nor do they argue on appeal, that ownership of the easements was expressly conveyed to WRC. Nevertheless, as noted *supra,* Easements 61, 62, and 63 were expressly made appurtenant to Wailea Alanui Drive. However, nothing in the record indicates that the easements were made an express part of the conveyance of the Golf Course to WRC. Accordingly, there is neither evidence nor argument that WRC owns the easements by virtue of an express grant.

### B. *WRC's Motion for Reconsideration*

#### 1. **Factual Background**

WRC filed a motion for reconsideration of the trial court's partial summary judgment order, contending *inter alia* and for the first time that the Association had not presented

sufficient evidence to demonstrate an intent by WDC to benefit the mauka properties and that the evidence suggested that the pipes had been laid exclusively for the benefit of the condominium project. WRC did not argue that the reasonable use rule was applicable. The trial court denied WRC's motion for reconsideration.

### 2. Standard of Review

 The trial court's ruling on a motion for reconsideration is reviewed under the abuse of discretion standard. *See First Ins. Co. of Hawai'i, Ltd. v. Lawrence*, 77 Hawai'i 2, 17, 881 P.2d 489, 504 (1994).

> As this court has often stated, "the purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion." Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding.

*Sousaris v. Miller*, 92 Hawai'i 505, 513, 993 P.2d 539, 547 (2000) (internal brackets and citations omitted).

### 3. Analysis

 Although WRC lists the trial court's denial of its motion for reconsideration as a point of error, the Association correctly calls to this court's attention the fact that WRC presents no argument on this point of error. Where an appellant raises a point of error but fails to present any accompanying argument, the point is deemed waived. *See Weinberg v. Mauch*, 78 Hawai'i 40, 49, 890 P.2d 277, 286 (1995). Accordingly, we decline to consider whether the trial court erred in denying WRC's motion for reconsideration.

### C. *Motion in Limine to Exclude Evidence of the Issue Whether Drainpipes Were Common Elements*

### 1. Factual Background

The parties proceeded to trial to determine: (1) whether the County owned easements in the locations of the drainpipes; and (2) the pro rata share of the repair and maintenance costs of the pipes that the owners of the easements would be required to pay. On September 22, 1997, the Association filed a motion in limine to exclude evidence of whether the drainpipes in question were common elements of Wailea Elua property. The trial court granted the motion on October 6, 1997.

### 2. Standard of Review

The standard of review applicable to the trial court's order granting the Association's motion in limine is an evidentiary decision based upon relevance and is therefore reviewed under the right/wrong standard. *See Walsh v. Chan*, 80 Hawai'i 212, 215, 908 P.2d 1198, 1201 (1995).

### 3. Analysis

 Again, although WRC lists the trial court's ruling on the motion in limine as a point of error, it does not argue this point in its opening brief. Accordingly, the point is waived, and we decline to address it. *See Weinberg*, 78 Hawai'i at 49, 890 P.2d at 286.

### D. *Trial: Presence or Absence of Easements for the County*

### 1. Factual Background

A bench trial was held on the remaining claims on October 6 through 9, 1997. The many exhibits admitted into evidence by agreement of all the parties were substantially the same exhibits considered by the court at the summary judgment proceeding. Also admitted was WDC's "roads and drainage systems" plan for the area, which bear a "final" date of July 3, 1973. This plan also contains the signatures of the County's Director of Public Works and Director of Planning, with the notation "approved" appearing next to each of the signatures. The County officials' signatures are dated April 6, 1973, twelve days before WDC conveyed Wailea Alanui Drive to the County and the County's subsequent acceptance of the conveyance. The plans include two "inlets" along the curb of future Wailea Alanui Drive through which water would drain from the road. Testimony adduced at trial indicated that the location of

the inlets corresponds to the subsequent location of Easements 62 and 63.

Among the Association's witnesses was Brian Gray, a civil engineer. Gray testified that, "from an engineering standpoint[,]" a "flowage easement" gives the upslope owner a right to drain water onto another party's land through the natural drainage ways and that the upslope party has no responsibility for what happens after the flowage leaves the upslope property. A "drainage easement," on the other hand, "normally involves either a pipe or some kind of conduit or an open channel and an easement that is surrounding it, and usually the person above is responsible for both maintenance and replacement, if necessary."

Alan Watanabe, the land surveyor and right of way agent for the County, testified that Easements 62 and 63—the Easements adjoining the road—resembled "apron easements" that the County often accepts. According to Watanabe, the County often accepts easements that include the concrete "apron" or basin into which culverts that pass under a road drain. The purpose of the concrete "apron" is to "protect the ground[,]" presumably from erosion, where "the water exits the pipe." Watanabe testified that the purpose of such easements in favor of the County is for maintenance of the concrete apron. Watanabe acknowledged, however, that he was not involved with the original work concerning the specific aprons or easements in this particular case. Also admitted into evidence was Watanabe's deposition testimony in which he acknowledged that he was aware of other situations in which the County held drainage easements where the County was responsible for repairing and maintaining pipes that were part of the easements.

Howard Hanzawa, a civil engineer for the County, testified that the reason the County places concrete aprons next to roadways is to ensure that County employees and their equipment can obtain access to culverts and drainage ways in order to clear them. However, Hanzawa had been working for the County for only four years and did not have any specific knowledge of the original circumstances of this particular development or the County's practices during the mid 1970s.

WRC called Carl Takumi, the civil engineer who designed the drainage system at Wailea Elua. In response to a question as to whether the culverts under Wailea Alanui Drive took water from the mauka properties and the road and deposited water where there were natural gullies that flowed towards the ocean, Takumi answered "I believe so." He also testified that the purpose of the fifty-four inch pipes was to "channel[ize]" water away from its natural flow through the Wailea Elua property to accommodate several buildings that were built in the natural drainage plain. However, Takuma's deposition testimony, which was also admitted into evidence, indicated that, in general, one could expect more water to run off from a concrete roadway than from unimproved land. Nonetheless, Takumi did not specifically know the permeability of the land that became Wailea Alanui Drive before the development of the roadway. In addition, at the time of his deposition and with the information available to him, Takumi was not able to opine as to whether the presence of the road altered the direction of the natural flow of the water. Takumi also interpreted portions of his earlier 1977 drainage studies. He testified that the south drainage system was designed with the idea that the culverts under Wailea Alanui Drive drained forty-six acres of mauka properties and that his calculation for drainage needs in the event of a fifty-year storm took into account the planned future development of those mauka properties.

The trial court ruled that the County was the holder of express or, alternatively, implied, easements in the pipes. The court's ruling included the following pertinent findings of fact (FOFs) and COLs:

## FINDINGS OF FACT

. . . .

10. The April 18, 1973 Deed and TCT No. 156986 conveyed to the County express drainage easements across lots adjoining Wailea Alanui [Drive], including the Wailea Elua property, with the intent that the precise location of such drainage

easements would be determined at a later time.

. . . .

14. Easements 61, 62 and 63 are located on and encumber the Wailea Elua property.

15. Openings in the curbs along Wailea Alanui to allow water to drain from Wailea Alanui are located along Wailea Alanui in the same locations as Easements 62 and 63.

16. Runoff water from Wailea Alanui flows through the openings in the curbs, then through catch basins located within Easements 62 and 63, and then flows through the 24″ and/or 54″ drainpipe systems located under the Wailea Elua property, ultimately outfalling in the area of Easement 61.

17. The Deed to the County dated April 18, 1973 specifically refers to the granting of easements for "drainage purposes" and a future "Grant of Easement" document as opposed to referring to "flowage easements" or making no reference to drainage issues.

18. The County is the owner of drainage easements, elsewhere in Maui County, and where the County holds drainage easements, the County is responsible for repairing and maintaining the drainpipes.

19. The language of the Deed dated April 18, 1973; the language of the Transfer Certificate of Title 156,869; the acceptance of the Deed by the County; the above-described creation of Easements 61, 62 and 63, the manner in which Wailea Alanui was constructed, and the manner in which the drainage systems at the Wailea Elua property were constructed manifested the intent that the location of the express easements previously conveyed to the County were to be the area within the Wailea Elua property where the 24″ and 54″ drainpipe systems are located.

20. Alternatively, the language of the Deed dated April 18, 1973; the language of the Transfer Certificate of Title 156,869; the acceptance of the Deed by the County; the above-described creation of Easements 61, 62 and 63, the manner in which Wailea Alanui was constructed, and the manner in which the drainage systems at the Wailea Elua property were constructed, manifest an intent to create implied easements in favor of the County in the location of and over and through the 24″ and 54″ drainpipes which run through the Wailea Elua property.

. . . .

### CONCLUSIONS OF LAW

. . . .

3. County is the owner of express drainage easements through the Wailea Elua property in the location of and through the 24″ and 54″ drainage systems located under the Wailea · Elua property.

4. Alternatively, County owns an implied easement through the Wailea Elua property in the location of and through the 24″ and 54″ drainage systems located under the Wailea Elua property.

### 2. Standards of Review

This court reviews the trial court's findings of fact under the clearly erroneous standard. *Beneficial Hawai'i, Inc. v. Kida,* 96 Hawai'i 289, 305, 30 P.3d 895, 911 (2001).

A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. A finding of fact is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Id.* (internal citations, quotation marks, brackets, and block quotation format omitted). Conclusions of law are reviewed de novo. *Id.*

### 3. Analysis

On appeal, the County makes five primary arguments in support of its contention that the trial court erred in ruling that it owned express and implied easements in the locations of the drainage pipes. First, the County

contends that, under the reasonable use rule, it has an absolute right to discharge surface water off of the road. Second, the County contends that it never accepted the easements. Third, the County contends that, pursuant to Rules of the Land Court (RLC) Rule 15(1) (1989), the easement must be in writing and may not be implied. Fourth, the County contends that it cannot own an implied easement in the location of the pipes because the Association did not adduce evidence that a quasi-easement existed at the time WDC severed its common ownership of the properties by conveying the future road to the County. Fifth, the County contends that the trial court's ruling will have an adverse fiscal impact on the County. We address each of these issues in turn.

### a. *reasonable use*

The County asserts that, under the reasonable use rule espoused in *Carter* and *Rodrigues*, it has an absolute right to discharge surface water off of Wailea Alanui Drive. The County submits that the Association failed to adduce sufficient evidence at trial to demonstrate that the diversion of surface water from the road was unreasonable. Therefore, the County, in essence, contends that the trial court erred because the County does not need a drainage easement for the road. Relying on the facts of *Carter*, the County argues that it cannot be responsible for damages caused by the failure of the drainage system.

In *Carter*, a downslope landowner sued Hawai'i County (Defendant) after an underground drain running through her property ruptured and caused flood damage to a home on her property. *Carter*, 47 Haw. at 69, 384 P.2d at 309. "Entrances" to the drain began on the upslope property owned by Defendant, and the drain followed the line of a natural watercourse through both properties. *See id.* at 69–71, 384 P.2d at 310. Most of the drain had been constructed at least fifty years earlier by unknown parties and at a time when both parcels were privately owned. *See id.* at 83, 384 P.2d at 316. The trial court found in favor of Defendant, and this court affirmed.

In her appeal, the plaintiff-landowner put forth two theories that are pertinent here. First, she contended that Defendant had violated the common law doctrine that limited a dominant owner from diverting surface waters into a natural drainage way that would not otherwise drain in that direction. *Id.* at 74, 384 P.2d at 312. This court held that the plaintiff-landowner had failed to adduce sufficient evidence that Defendant had impermissibly altered the natural flow of water. *See id.* at 74–76, 384 P.2d at 312–13. Consequently, Defendant was permitted to utilize the underground drain without liability. *See id.*

Subsequently, in *Rodrigues*, this court "clarified" the rule discussed in *Carter* to articulate the reasonable use rule noted earlier. Discussing *Carter* and other cases, this court stated:

> Our decisions, then, allow possessors of land to guard themselves against the hazards of surface water so long as reasonable precautions are taken not to negligently injure others. We believe our decisions so closely approach the reasonable use rule that it is incumbent upon us to adopt it. We hold that each possessor of land may interfere with the natural flow of surface water for the development of his land so long as such interference is not unreasonable under the circumstances of the particular case.

*Rodrigues*, 52 Haw. at 164–65, 472 P.2d at 516 (footnote omitted). Comparing the facts of this case to those of *Carter* and applying the rule announced in *Rodrigues*, the County contends that the Association is a downslope owner who failed to demonstrate that the County's improvements to the road unreasonably altered the drainage of surface waters. In particular, the County relies upon testimony that the purpose of the pipes was to channelize water to facilitate development on Wailea Elua, suggesting that there was no evidence that the road unreasonably altered the flow of surface water. Accordingly, like Defendant in *Carter*, the County maintains that it is not liable for damages to the pipes on Wailea Elua property.

However, regardless of whether the improvements to the road constitute "reason-

able use" of upslope property, the plaintiff-landowner in *Carter* put forth another argument which, although not accepted by the court in *Carter*, is applicable here. The plaintiff-landowner in *Carter* also argued that Defendant had "adopted the drain as a part of its public drainage system" and thereby became responsible for its maintenance. *Carter*, 47 Haw. at 78–79, 384 P.2d at 314. Agreeing that a municipality could become responsible for a drainage system if it either (1) adopted (or "accepted") a drainage system, or (2) assumed control of a drainage system, this court held that there was no evidence of either. *See id.* at 79–80, 384 P.2d at 314–15. In addressing the first circumstance, this court explained:

> There is no evidence of any *express dedication of an easement* for a drain through plaintiff's property by her or by any predecessor in title. Nor is there any evidence tending to show *intention* on the part of the board of supervisors of the county or of any other county official with proper authority to act, to take over the drain on her property.

*Id.* at 79–80, 384 P.2d at 314–15 (emphases added). Thus, if the County "accepted" or "adopted" drainage easements across Wailea Elua, then consideration of the reasonable use rule is unnecessary. Accordingly, we turn to the County's second contention, *i.e.*, that it never accepted such easements.

### b. *acceptance of easements*

■ The County contends that it did not accept easements across Wailea Elua. Specifically referring to Easements 61, 62, and 63, the County submits that the easements cannot be forced upon it because the language of the deed to Wailea Alanui Drive conveying the easements was conditional and the County never accepted the easements. As previously stated, the language of the deed, conveyed the future road (Lot 5) to the County together with:

> *easements for drainage purposes* over, under and across portions of the lots adjoining Lot 5, said easements to be determined and designated after construction of the improvements in Lot 5 has been completed by [WDC], and *[WDC] agree[s] to promptly file a petition to designate such ease-*

*ments and to execute Grant of Easement documents in favor of the [County] in such form as shall be mutually agreed upon;* provided that [the County] shall execute a document canceling this grant concurrently with the execution of Grant of Easement documents from [WDC] to [the County].

(Emphases added.) The language of the deed expressly conveyed drainage easements to the County that were appurtenant to the road; this deed was *accepted* by the County Council the following day. However, the *location* of the drainage easements was conditioned upon further agreement between WDC and the County. Apparently, a "meeting of the minds" never transpired with respect to location, notwithstanding the fact that WDC designated Easements 61, 62, and 63. The Association argues that, even though the location of Easements 61, 62, and 63 was not mutually agreed upon, "subsequent events" established the County's acquiescence as to the location of the easements. As discussed below, we agree that, under the particular circumstances of this case, the County "accepted" Easements 61, 62, and 63 and that, therefore, the trial court did not err in concluding that the County also possessed easements in the location of the pipes connecting Easements 61, 62, and 63.

Substantial evidence adduced at trial supports the conclusion that the County intended to possess drainage easements involving drainpipes through the Wailea Elua property. Brian Gray, a civil engineer, testified that, from an engineering perspective, the term "drainage easement" typically involves a pipe or conduit in which the holder is responsible for its maintenance and repair. Gray contrasted this with a "flowage" easement, in which the upslope owner has no such responsibility. Alan Watanabe also acknowledged that he was aware of other situations where the County was responsible for repairing and maintaining pipes that were part of drainage easements. This evidence of engineering practice supports the conclusion that the County intended to be responsible for pipe maintenance when it accepted the "drainage" easements in the deed. Moreover, WDC's 1973 "roads and drainage"

plan, which was reviewed and approved by County officials before the County Council accepted the deed, showed curb inlets where water would be draining off of the proposed Wailea Alanui Drive; it would only be logical that such inlets would lead to the locations that WDC subsequently designated as easements. Given that the road was part of a larger development, the reasonable inference that can be drawn from the evidence is that the County knew that pipes would be used to carry water from these locations. Although there was contradictory testimony that the roadside easements constituted "apron" easements, whose purpose was merely to prevent erosion or to permit the County to obtain access to the culverts passing under the road, an appellate court will not pass upon issues dependent on the credibility of the witnesses and the weight of the evidence, which are matters within the province of the trier of fact. *In re Doe*, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001). Consequently, the trial court did not err when it effectively found that the County "intended" to possess drainage easements and the pipes associated therewith. *See* Findings of Fact noted *supra* at 111–112, 58 P.3d at 623–624. Under the particular circumstances of this case, it can be concluded that the County "accepted" easements for drainage purposes across Wailea Elua.

The County points out that Easements 61, 62, and 63 do not contain the actual area of land where the underground drainpipes traverse Wailea Elua. The County is correct. However, it would not be possible to effectuate the intent to utilize drainpipes to drain water away from the locations of Easements 62 and 63 without the drainpipes themselves. Moreover, the water from these locations apparently would not drain to Easement 61 without the presence of the pipes. Thus, although the only definitively located "express" easements are Easements 61, 62, and 63, the need for the existence of the pipes connecting Easements 61, 62, and 63 is essential for the proper functioning of those easements. Pursuant to *Restatement, su-*

*pra*, § 4.10, "the holder of an easement or profit ... is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude." *See also Restatement, supra*, § 4.10 comment c ("Under the rule stated in this section, the servitude holder is entitled to make any use of the servient estate that is reasonably necessary for the convenient enjoyment of the easement. Even when the easement is located in a specific portion of the servient estate, the servitude beneficiary has the right to use other parts of the servient estate when reasonably necessary for convenient use of the easement.... Frequently, reasonably necessary uses will also include making improvements or constructing improvements for use of the easement. If necessary, additional areas of the servient estate may be used during construction. The right to use additional areas of the servient estate is sometimes called a "secondary" easement. Conceptually, a secondary easement can be regarded either as an easement by necessity or as inherently included within the primary-use rights granted by the easement."); *cf. Adair v. Kona Corp.*, 51 Haw. 104, 114, 452 P.2d 449, 455 (1969) ("The absence of metes and bounds description [in an express easement] would not have posed any insurmountable problem in case of disagreement between the mortgagor and the mortgagee, for the law is that where an easement is not definitely located in a grant or a reservation, and the dominant and servient owners fail to agree, a court may locate it in the exercise of its equity powers."). Based on the foregoing, the trial court did not err in concluding that the County's express easements include easements in the locations of the twenty-four inch and fifty-four inch drainpipes.

### c. *RLC rule 15(1)*

■ The County also points to the fact that the land in question is under the jurisdiction of the land court and that, pursuant to RLC Rule 15(1),[9] "[e]asements in land

---

9. RLC Rule 15(1) states:
 A petition for the subdivision of land or for the consolidation of lots of a previous subdivision or for the designation of an easement or matters of

a like nature shall be filed in duplicate and shall be signed and sworn to by the person in whose name the certificate of title has issued or by his attorney or by an agent duly authorized by him.

court must be in writing and may not be implied." Because the easements in the pipes are necessary parts of the express easements, which *are* memorialized in writing and filed with the Land Court, the County's argument on this point is not directly applicable.

#### d. *implied easement*

The County also contends that the trial court erred in ruling that it held implied easements in the location of the pipes. Because the easements are necessary parts of the express easements, this court need not consider the implied easement issue. ·

#### e. *fiscal impact on the County*

The County contends that the trial court's ruling is "a clear deviation" from the reasonable use rule and that, if the County is held responsible in this case, it will be faced with many similar claims. The holding in this case is based narrowly on the fact that the County "accepted" express easements, and the substantial evidence supporting this holding is based on specific testimony suggesting that the County intended to possess such easements. Nothing precludes a future trial court in another case from concluding that there was no such acceptance or intent based upon the particular evidence presented to it. We, therefore, affirm the trial court's ruling, as articulated in COL No. 3, that the County is the owner of express drainage easements through the Wailea Elua property in the location of and through the twenty-four inch and fifty-four inch drainage systems located under the Wailea Elua property.

### E. *Trial: Qualification of Expert Testimony*

#### 1. **Factual Background**

The Association contended that WRC should be responsible for 100% of the costs of repairing and maintaining the drainpipes. In support of this contention, the Association provided expert testimony opining that the deterioration in the drainpipes was caused by corrosive inorganic salts coming from fertilizer and brackish water used by the Golf Course owned by WRC.

In contrast, WRC offered the testimony of Nolan Perreira as an expert in the field of metallurgy and corrosion analysis. Perreira's qualifications included, *inter alia:* (1) a Bachelor of Science degree in metallurgy from the Massachusetts Institute of Technology; (2) a Master's Degree in Engineering, specializing in metallurgy and material sciences, from Brown University; (3) a license as a "registered professional engineer in the field of metallurgy" in California; (4) experience in the United States Navy as a Chief Engineer on a 15,000 ton vessel, responsible for the operation, maintenance, and repair of the vessel's steam and water systems, where he dealt with issues concerning corrosion; (5) experience as a project engineer responsible for water chemistry and hydraulics during the startup construction of a nuclear power plant; (6) deputy director and director of the Maui County Department of Water Supply, where he dealt with issues concerning corrosion and pipe operations; and (7) industrial engineer for Hawai'ian Commercial and Sugar Co., where he "recommended materials for use in corrosive and erosion-prone locations." During voir dire, the Association ascertained that Perreira was presently employed as a stockbroker and had worked on only four assignments as an independent engineering consultant in the two-year period preceding the trial. The Association and the County unsuccessfully objected to qualifying Perriera as an expert on the grounds that he did not have the experience or qualifications to testify as to the particular corrosion issues in this case.[10] Perriera opined that there

---

In the latter case, the power of attorney of the agent must be filed with the petition. A map shall be filed with each petition. Leases, mortgages and similar encumbrances need not be noted or referred to if all lots in the subdivision are affected. When any of the encumbrances affects one or more but not all of the lots created by such subdivision and it is desired to confine such encumbrance or encumbrances to the lot or lots affected, the petition shall clearly set forth the lot or lots affected.

**10.** Perriera's subsequent testimony also established that he had conducted on-site inspections in this case, taken water samples, reviewed a videotape of the drainage system, and had inspected and compared different segments of

was no evidence that corrosion in the pipes was caused by chemicals that were specifically related to the golf course and that, in fact, the corrosion was caused by wet debris in the drainage pipes that created a corrosion-prone environment.

Relying on Perriera's testimony, the trial court concluded:

[The Association] has failed to meet its burden of proof to sustain its claim that the corrosion in the 24″ and 54″ pipe systems on the Wailea Elua property is caused by chemicals or water from the [Golf Course]. As such, WRC cannot be made responsible for 100% of the current cost to repair and/or replace the 24″ and 54″ drainage systems.... Therefore, the responsibility for the current and future cost to repair and/or replace and maintain the 24″ and 54″ drainage systems must be ratably shared amongst the parties that use the drainage systems.

## 2. Standard of Review

■ Subject to the discussion herein, whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion. *Montalvo v. Lapez,* 77 Hawai'i 282, 301, 884 P.2d 345, 364 (1994).

## 3. Analysis

■ The County contends that the trial court erred in qualifying Perriera as an expert witness because, although he has a bachelor's degree in metallurgy, "his work experience did not involve the study of corrosion analysis except in a tangential way." Therefore, the County submits that the trial court's conclusion that inorganic salts from the golf course did not cause the corrosion in the pipes was erroneous. WRC answers that the trial court did not abuse its discretion.[11]

drainpipes and compared them to other sections showing different levels of corrosion.

11. The Association takes no position on this argument, noting that if Perriera's testimony is inadmissible, then WRC should be responsible for 100% of the pipe maintenance because the

■ Hawai'i Rules of Evidence (HRE) Rule 702 (1993) sets forth the requirements for qualification of an expert witness. HRE Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

In applying this rule, the trial court must determine whether the expert's testimony is (1) relevant, and (2) reliable. *See State v. Vliet,* 95 Hawai'i 94, 106, 19 P.3d 42, 54 (2001). The County does not dispute the relevance of Perriera's testimony, but apparently challenges its reliability. The trial court's determination as to reliability is reviewed under the abuse of discretion standard. *Id.* at 107–08, 19 P.3d at 55–56.[12]

■ In this instance, the trial court did not articulate its rationale for accepting Perriera's qualifications. However, Perriera earned degrees in metallurgy, engineering, and had some work experience involving corrosion issues in water pipes. The County's argument rests on the fact that Perriera was employed as a stockbroker and had little recent experience. "It is not necessary, however, for the expert witness to have the highest possible qualifications to enable him or her to testify as an expert." *Yap v. Controlled Parasailing of Honolulu, Inc.,* 76 Hawai'i 248, 254, 873 P.2d 1321, 1327 (1994); *see also Larsen v. State Sav. and Loan Assoc.,* 64 Haw. 302, 304, 640 P.2d 286, 288 (1982). Accordingly, the trial court did not abuse its discretion in qualifying Perriera as an expert. Because "it is within the province of the trier of fact to weigh the evidence and to assess

Association's own expert testified that chemicals from the Golf Course caused the corrosion.

12. Determinations of relevancy, as usual, are reviewed de novo. *See Vliet,* 95 Hawai'i at 106–07, 19 P.3d at 54–55.

the credibility of the witnesses, and this court will refrain from interfering in those determinations[,]" *LeMay v. Leander*, 92 Hawai'i 614, 626, 994 P.2d 546, 558 (2000), it also follows that the trial court did not err in accepting Perriera's conclusion that inorganic chemicals from the Golf Course were not the cause of the corrosion in the pipes.

### F. Allocation of Responsibility for Repair and Maintenance of the Pipes

As an alternative basis for establishing responsibility for the repair and maintenance costs of the pipes, the Association argued that responsibility should be based on the amount of water flowing from each of the parties' respective properties. The Association and WRC each presented expert testimony concerning the relative amounts of runoff attributable to each property. The County did not put forth any evidence concerning the allocation of water runoff from the various properties. The court adopted the methodology of WRC's expert and largely accepted his figures. COL Nos. 9 and 10 stated:

> 9. The [c]ourt recognizes that neither Mr. Nance's [WRC's expert] nor Mr. Gray's [the Association's expert] allocation methodology is flawless. However, Mr. Nance's analysis is based on use, while Mr. Gray's "peak flow analysis" is based on a hypothetical 50–year rainfall event. While the "peak flow analysis" is relevant to pipe system design, the issue facing the [c]ourt is allocation of responsibility for repair/replacement and maintenance based on *use*. Thus, the [c]ourt concludes that Mr. Nance's analysis is the most reasonable allocation method proffered by the parties.
>
> 10. [The Association], County and WRC are responsible for the current and future repair, maintenance and/or replacement of the 24″ and 54″ drainage systems located under the Wailea Elua property and the 18″ and the two 36″ drainpipes located under Wailea Alanui in the following proportions:

| [twenty-four inch (north) drainpipe system | |
|---|---|
| WRC | 0.8667% |
| County | 49.2406% |
| Association | 49.8926% |
| fifty-four inch (south) drainpipe system | |
| WRC | 71.758% |
| County | 8.340% |
| Association | 20.029%] |

(Emphasis in original.) The only difference between the trial court's conclusion and the conclusion reached by WRC's expert was that the expert had assigned approximately 6.1% of the runoff in the south drainpipe system to the Fairways Subdivision, which is not owned by WRC. The trial court apparently added this 6.1% to WRC's allocation of responsibility because the percentage it attributed to WRC is the total of the runoff from all of WRC's properties and Fairways Subdivision combined, while the runoff percentages assigned to the County and the Association do not differ from those attributed to the road and Wailea Elua, respectively.

The trial court also entered the following FOFs:

> 21. Unless significant rainfall occurs, runoff water from [Fairways Subdivision] property and the Grand Champions condominium project [a neighboring property not involved in this case] is absorbed into the ground of the [Golf Course].
>
> 22. Runoff water from the [Golf Course] property; properties designated as MF–12, 13, and 8; and Wailea Alanui flows into the [south drainage system] located under the Wailea Elua property. During periods of significant rainfall runoff water from [Fairways Subdivision] and the Grand Champions condominium project combines with the golf course runoff water and flows into the [south] drainage system.
>
> 23. Runoff water from the [Golf Course] and Wailea Alanui enter the [north drainage system] which runs under the Wailea Elua property. During periods of significant rainfall, runoff water from [Fairways Subdivision] combines with the golf course runoff water and flows into the [north] drainage system.

### 2. Standard of Review

The trial court's ruling concerning apportionment of responsibility for repair and maintenance costs involves the exercise of its equitable powers. Accordingly, its ruling is reviewed under the abuse of discretion stan-

dard. *Sandstrom v. Larsen,* 59 Haw. 491, 494, 583 P.2d 971, 975 (1978).

### 3. Analysis

WRC contends that the trial court erred in allocating repair and maintenance costs that are attributable to the Fairways Subdivision and the time period before WRC purchased the Golf Course. We address each contention.

#### a. *runoff from Fairways Subdivision*

 WRC argues that the trial court erred in calculating its allocation of responsibility in the south drainpipe because the court attributed runoff to WRC from the Fairways Subdivision, which WRC does not own. WRC submits that, because the trial court apparently relied on WRC's expert's figures and there is no evidence that WRC ever owned the Fairways Subdivision, the court's allocation of runoff from Fairways Subdivision to WRC is clearly erroneous. However, the trial court apparently did not adopt all of the runoff conclusions of WRC's expert, Mr. Nance, as evinced by its findings that ordinarily, runoff water from the Fairways Subdivision does not reach the south drainage system. WRC does not challenge these FOFs and, according to the court's conclusions, it adopted its equitable decision to allocate costs based upon *ordinary use* of the system rather than use of the system during heavy rainfall. Thus, the court apparently assigned the 6.1% allocation of "runoff" that was otherwise unaccounted for in Mr. Nance's analysis to WRC. The question is whether this assignment constitutes an abuse of discretion.

> The trial court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. Stated differently, an abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*Molinar,* 95 Hawai'i at 335, 22 P.3d at 982 (internal block quotation format omitted).

Although not clearly explained, the trial court's decision to allocate the 6.1% of runoff to WRC, where WRC was already responsible for approximately 65% of the runoff, does not "clearly exceed the bounds of reason" or "disregard rules or principles of law or practice" to WRC's substantial detriment. Nor does the decision appear to rest on a clearly erroneous view of the law or evidence—the court made unchallenged findings that the Fairways Subdivision does not contribute to the runoff. The trial court is not required to assign proportionate responsibility to each party with mathematical precision or according to the exact percentages suggested by the expert testimony. Consequently, we hold that WRC has not met its appellate burden of establishing that the trial court abused its discretion in allocating responsibility for maintenance and repair costs.

#### b. *costs attributable to the time before WRC owned the Golf Course*

 WRC also contends that the trial court erred by assessing WRC for repair costs attributable to the time period before it owned the Golf Course. Thus, WRC appears to argue that it is not responsible for "wear and tear" in the pipes prior to its purchase of the Golf Course. When WRC acquired the Golf Course, it did so with all appurtenant easements, together with the rights and responsibilities attendant to it. Consequently, the trial court did not err in assessing all of the current costs against WRC for its role as a present "owner" of the easement.

### G. *WRC's Offer of Judgment and Post–Trial Motion for Costs*

#### 1. Factual Background

On April 29, 1997, subsequent to the summary judgment proceedings but before trial, WRC tendered an offer of judgment to the Association in the amount of $45,000, "inclusive of all costs incurred to date, for all damages, past, present, and future, including all repair and maintenance costs[.]" WRC stated that its offer was tendered pursuant to HRCP Rule 68, discussed *infra.* WRC further indicated that

> this offer of judgment is made to resolve the lawsuit without any admission by [WRC] that the Order Granting [The Asso-

ciation's] Motion for Partial Summary Judgment with Respect to [WRC] ... is correct, appropriate, or binding upon [WRC].

The Association did not accept WRC's offer.

As a result of the trial, WRC was ordered to pay the Association 71.758% of the $23,195.36, or $16,664.53, in costs that the Association had incurred for the repair of the south drainage system. On December 30, 1997, WRC filed a post-trial motion for costs pursuant to HRCP Rule 68. WRC contended that, because the Association had rejected its April 29, 1997 HRCP Rule 68 offer of judgment for $45,000 and had only recovered $16,664.53 as a result of the court's judgment, the Association was liable for WRC's subsequent costs and attorneys' fees totaling $147,776.90. The trial court denied WRC's motion, ruling that WRC's earlier offer of judgment was not a valid HRCP Rule 68 offer because it did not dispose of all of the Association's claims.

### 2. Standard of Review

The trial court's rulings concerning the award of attorneys' fees and costs are generally reviewed under the abuse of discretion standard. *See Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 456, 32 P.3d 52, 100 (2001); *Molinar*, 95 Hawai'i at 335, 22 P.3d at 982.

### 3. Analysis

 WRC argues that the trial court erred in denying its motion for costs pursuant to HRCP Rule 68, which requires that the plaintiff pay the defendant's costs that accrue subsequent to a valid HRCP Rule 68 offer of judgment if the judgment finally obtained by the plaintiff is less than the offer. According to WRC, it offered the Association $45,000 prior to trial and the ultimate judgment against itself in favor of The Association was only $16,644.53. Therefore, WRC asserts that it is entitled to costs and attorneys' fees incurred subsequent to its offer of judgment.

HRCP Rule 68 states in pertinent part:

At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against him [or her] for the money or property or to the effect specified in [the] offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service and thereupon the clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. *If the judgment finally obtained by the offeree is not more favorable than the offer*, the offeree must pay the costs incurred after the making of the offer.

(Emphasis added). In *Crown Properties, Inc. v. Financial Sec. Life Ins. Co.*, 6 Haw. App. 105, 712 P.2d 504 (1985), the Intermediate Court of Appeals (ICA) stated:

To qualify as a [HRCP] Rule 68 offer, the offer must be such that a judgment in the words of the offer will fully and completely decide the claim or claims toward which the offer is directed. It also must comply with [HRCP] Rule 68's express requirements. Thus, it can be made only by a party defending a claim and can relate only to a claim or claims which the offeror is defending against.

[HRCP Rule 68] does not limit any party's right to tender a non-[HRCP] Rule 68 offer of partial or complete judgment or compromise. However, an offer that does not satisfy the requirements of [HRCP] Rule 68 does not entitle the offeror to the special benefits of [HRCP] Rule 68.

*Id.* at 113, 712 P.2d at 510 (citations omitted). In *Crown Properties*, the defendant in a dispute involving a commercial sublease offered a sum of money to resolve the issue of past-due rent owed, but the offer did not address the plaintiff sublessor's claims seeking a declaratory judgment terminating the sublease and a writ of possession. *Id.* at 107, 110, 113–14, 712 P.2d at 506, 508, 510. The ICA held that the offer was too "insufficient and incomplete" to qualify as a HRCP Rule 68 offer of judgment. *Id.* at 113, 712 P.2d at 510.

In this case, WRC tendered an offer of judgment to the Association in the amount of $45,000. WRC's offer excluded the Association's claim for declaratory judgment seeking to establish ownership of the drainpipes, reserving to WRC the right to further challenge the trial court's order granting the Association's motion for partial summary judgment on the issue of who owned the drain pipes. By its own terms, WRC's offer was not a valid HRCP Rule 68 offer because it did not fully and completely resolve the Association's claims.[13] Therefore, the trial court did not err in denying WRC's motion for costs.

### III. CONCLUSION

Based on the foregoing analysis, we affirm the circuit court's March 9, 1999 amended final judgment.

Concurring Opinion by RAMIL, J., in which ACOBA, J., Joins.

I agree with the majority in affirming the trial court's judgment. Majority opinion at 100, 58 P.3d at 611. However, I feel compelled to write separately because I disagree with the majority's reasoning on two points. First, I believe that Wailea Resort Company (WRC) owns express easements, rather than implied easements. Second, I disagree with the majority's conclusion that "WRC's offer ... did not fully and completely resolve the Association's claims." Majority opinion at 120–121, 58 P.3d at 631–632. In my view, WRC's offer was a valid HRCP Rule 68 offer. However, as I explain below, the dispositive issue, with respect to WRC's offer of judgment and post-trial motion for cost, is whether the judgment finally obtained by the Association is more favorable than the offer. Based on the "analytical" approach I set forth below, I respond in the affirmative. Accordingly, the trial court did not err in denying WRC's motion for costs. With respect to the remaining issues not discussed herein, I agree with the majority's conclusions.

### I. CREATION OF EXPRESS OR IMPLIED DRAINAGE EASEMENTS

I agree with the majority insofar as it affirms the trial court's conclusion that both WRC and the County own easements in the drainage pipes and are, therefore, responsible for the maintenance and repair of the easements. I also agree with the majority's upholding of the trial court's order allocating WRC's costs of maintaining and repairing the easements based on its responsibilities as owner of the easements. Nonetheless, I believe that the easements in this case are more properly characterized as construction of express easements, rather than creation by implied easements.

### A. WRC's Easements

WDC's petition for designation of easements, which was approved by the land court on July 8, 1977, expressly and specifically reserves easements 62 and 63—which are at the intake of the drainage system—and easement 61—which is at the outfall of the drainage system—for drainage purposes. Moreover, WDC not only reserved the right "to designate and grant easements over, under, and across [Wailea Elua] for ... storm sewers" in its Declaration of Horizontal Property Regime Under Chapter 514, Hawai'i Revised Statutes, but also expressly designated such easements for drainage purposes in its apartment deeds with the individual apartment owners.

Although the trial court concluded that WRC owns implied easements in the drainage systems, the easements in this case are more properly characterized as construction of express easements, rather than creation by implied easements. An express easement is distinguished from an implied easement inasmuch as the latter is "[o]ne which the law imposes by inferring the parties to a transaction intended that result, although they did not express it.... One not expressed by parties in writing but arises out of existence

---

**13.** We respectfully disagree with Justice Ramil's contention that WRC's offer of judgment, releasing it from past, present, and future damages, would have, in effect, disposed of the Association's claim that WRC owned the easements or all of the Association's future causes of action related to the issue of ownership.

of certain facts implied from the transaction."[1] *Black's Law Dictionary* 510 (6th ed.1990). Generally, an express easement is created by the language in a written instrument; whereas an implied easement stems from other factors, such as original unity of ownership and whether the easement is "apparent," "permanent," and "important for the enjoyment" of the dominant estate. *See Neary v. Martin,* 57 Haw. 577, 580, 561 P.2d 1281, 1283–84 (1977); *Tanaka v. Mitsunaga,* 43 Haw. 119 (1959); *Thompson on Real Property* § 60.03(a) at 405–06, § 60.03(b)(4) at 426–30 (Thomas ed., 1994 & Supp.2000); *Powell on Real Property* § 34.08 at 79–99 (Wolf ed., 2000). To the extent that intent is a factor in creation of an easement,[2] intent determined primarily by examining express language of a written instrument creates an "express" easement, while intent generally inferred from other sources establishes an "implied" easement. *Thompson on Real Property* § 60.03(a)(1) describes express easements similarly:

> Persons in possession of property may create express easements by grant, for a consideration or by gift, transferring away the right or rights represented by the easement to another. . . . The person creating the easement must intend to create such an interest and observe the proper formalities in the local jurisdiction for transferring property by grant or by devise.

*Id.* at 405.

Here, WDC demonstrated in writing its intent to create easements through express language of a grant, which specifically asked for recognition of "Easement 61, affecting Lot 78 [Wailea Elua], for drainage, landscaping, pedestrian access, recreational and building setback purposes[; and] Easement[s] 62 and 63, affecting Lot 78, for drainage purposes." In addition, such grant was registered with the land court in accordance with HRS § 501–82 (1993 & Supp.1998). *See Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 114 n. 8, 839 P.2d 10, 27 n. 8 (1992) (citations omitted).

In 1944, the Supreme Court of the Territory of Hawai'i noted that an easement may be created by either an express grant or implication by prescription. The court then distinguished the two by explaining that the former "is by special permission of the owner of the fee. The grant itself is the best evidence of title and it derives no strength from time or occupation." *Lalakea v. Hawai'ian Irrigation Co.,* 36 Haw. 692, 706 (1944) (quotation and internal quotation marks omitted). In contrast, the latter "is by use and occupation for the [statutorily established] period. . . . Such use and occupation are substituted for the grant. In other words, they give rise to the presumption that a grant existed, since lost or destroyed by time or accident." *Id.* (citations omitted).

Even earlier and more instructive are the observations of the Supreme Court of the Republic of Hawai'i in 1893. In the context of ways of necessity, the court distinguished creation by grant, prescription, and implication:

> Ways are commonly said to be created by grant, by prescription or by necessity. But these distinctions related to the mode of their proof rather than to the mode of their creation. It would be more correct to say that ways are created by express grant, by presumed grant and by implied grant—or reservation, as the case may be. In every instance the way is created by grant, or reservation, the difference being merely in the mode of proof. The question as to what is granted or reserved is a question of intention to be shown by com-

---

**1.** The difference between an "express" and "implied" easement is emphasized by the definition of "express": "Declared in terms; set forth in words. . . . Manifested by direct and appropriate language, as distinguished from that which is inferred from conduct." *Black's Law Dictionary* 580 (6th ed.1990).

**2.** For instance, recognition of an express easement in Hawai'i requires compliance with the land registration statute, which is premised on preserving the integrity of titles, rather than im-

plementing parties' intent. *See* HRS § 501–82 (1993 & Supp.1998); *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 114 n. 8, 839 P.2d 10, 27 n. 8 (1992) (citing cases). Another example where intent may not be the only consideration is implying an easement by necessity. *See Powell on Real Property* § 34.07 at 70–71 (question as to whether such easements are products of public policy or inferences as to parties' intent).

petent evidence. In the case of an express grant the intention is proved generally by the terms of the instrument alone. In the case of a presumed grant it is proved by an adverse user for twenty years. In the case of an implied grant it is proved by all the circumstances of the case, and especially by the condition of the property at the time of the conveyance.

*Kalaukoa v. Keawe*, 9 Haw. 191, 192–93 (1893).

Here, WRC and the County assert that there is no express language specifying a grant of drainage easement for the pipes themselves. The *Kalaukoa* court, however, explained the proper interpretation of an express grant with respect to location and width:

> The same rules which apply to the existence of a way apply equally to its location, direction, width and the purposes for which it may be used. The question is merely one of intention, to be proved by competent evidence.
>
> If the way is created by an express grant, which defines its location, direction, width and uses, the only evidence is to be found in the grant itself; but if the grant merely provides for the existence of the way, with no provision as to its location, width and uses, these must be ascertained by other evidence, such as the condition or character of the lands and the uses made of them, or the acts or acquiescence of the parties.

*Id.*

Likewise, *Thompson on Real Property* § 60.03(a)(7) points out that in interpreting an express grant, intent of the parties is paramount:

> [A]ny words which clearly show the intention to give an easement, which is by law grantable, are sufficient to effect that purpose, providing the language is sufficiently definite and certain in its terms. Neither words of limitation, nor words of inheritance, nor technical terminology are necessary to create an easement. If the language of the grant is free from ambiguity, it is not the subject of interpretation, and no resort to extrinsic facts and circumstances may be made to modify the clear

terms of the grant. To determine whether an easement is the intention of the parties, courts will examine the language of the grant, the circumstances surrounding its creation and the property involved, with construction in favor of the grantee.

*Id.* at 415 (quotations, citations, and internal quotation marks omitted). *See also Los Angeles v. Howard*, 244 Cal.App.2d 538, 543, 53 Cal.Rptr. 274, 277 (1966) ("The extent of a servitude is determined by the terms of the grant, . . . and the extent of an easement is a question of interpretation. Where an easement is founded upon a grant, . . . only those interests expressed in the grant and those necessarily incident thereto pass from the owner of the fee."); *Powell on Real Property* § 34.12[2] at 185–89 (describing the flexibility given to the courts in construing grants of express easements).

In *Isenberg v. Woitchek*, 144 Colo. 394, 356 P.2d 904 (1960), an express grant of easement for right of way described only the place of entry and exit, without detailing the width or exact course across the servient estate. The Colorado Supreme Court explained, "The rule is that vagueness of description does not go to the existence or validity of an easement. While an extreme case of vagueness could result in a holding that no easement was granted, the present factual situation does not produce such result." *Id.* at 907. Rather, the court clarified that the lack of express location does not invalidate an express grant of easement:

> It is a settled rule that where there is no express easement agreement with respect to the location of a way granted but not located, the practical location and user of a reasonable way by the grantor or owner of the servient estate, sufficiently locates the way, which will be deemed to be that which was intended by the grant.

*Id.* (quotation and internal quotation marks omitted).

Similarly, the language granting the easements here is not that of a "careful conveyancer [who avoids the] risks of borderline language." *Powell on Real Property* § 34.04 at 32. Although an express grant of easement should "specify carefully the acts on the

servient land which are thereby privileged," *id.* at 32–33, this does not mean that an express easement requires the most extensive and exhaustive description. In interpreting express easements, *Thompson on Real Property* § 60.03(a)(7) observes that "[s]o long as the words make clear the intention to create an easement, the law does not require perfection in its description." *Id.* at 415. *See also Murdock v. Ward,* 267 Ga. 303, 477 S.E.2d 835, 836 (1996) ("[T]he law does not require perfection in the legal description of an easement.").

Although WDC's easements include the inflow and outflow of the drainage systems, without specifying that such easements include the drainage pipes themselves, it is clear from the express language that they are included. To hold easements only at the ends of the drainage systems would be a hypertechnical and nonsensical reading of the express grant of drainage easements. In fact, easements 61, 62, and 63, which are expressly for drainage, would be useless if they did not include the drainage pipes. Thus, WRC, as WDC's successor in interest with respect to the golf course, holds express easements in the entire drainage systems— from inflow to outflow.

In addition, the grant of drainage easements, which include the drainpipes, fulfills the "fundamental intent" of the land court registration statute: "to preserve the integrity of titles." *Waikiki Malia Hotel, Inc. v. Kinkai Properties Ltd. Partnership,* 75 Haw. 370, 391, 862 P.2d 1048, 1060 (1993). This court explained that "[t]he integrity of titles can only be preserved if anyone dealing with registered property is assured that the only rights or claims of which he need take notice are those which are registered in the prescribed manner." *Id.,* 862 P.2d at 1061 (quoting *Honolulu Mem'l Park, Inc. v. City and County of Honolulu,* 50 Haw. 189, 193–94, 436 P.2d 207, 210 (1967)). Here, the express grant of easements for the inflow and outflow of the drainage system would provide reasonable notice to the public that such easements include the drainpipes connecting the intake and outflow of the system. After all, granting easements for drainage that do not include a practical method of draining water would be absurd.

Although the trial court's analysis concerning an implied easement is different from mine, the conclusion is the same: WRC owns easements in the drainage systems and is, therefore, responsible for the maintenance and repair of the systems. "[I]t is . . . well established . . . that an owner of an easement has the right and the duty to keep it in repair." *Levy v. Kimball,* 50 Haw. 497, 498, 443 P.2d 142, 144 (1968) (citations omitted). Moreover, the original apartment deeds contain an express covenant to repair in favor of the condominium, which was assumed by WRC in the Purchase and Exchange Agreement.

Accordingly, the trial court did not err by granting the Association's motion for partial summary judgment.

## II. *MOTION FOR COSTS*

The majority holds that the trial court did not err in denying WRC's motion for costs. Majority opinion at 120–121, 58 P.3d at 631–632. I agree. However, I write separately to note that the majority erroneously grounds its holding on its mischaracterization of WRC's offer as an invalid offer. *See id.* In my view, WRC's offer was a valid HRCP Rule 68 offer, because it would have fully and completely resolved the Association's claims against WRC. *Cf.* majority opinion at 120–121, 58 P.3d at 631–632 ("By its own terms, WRC's offer was not a valid HRCP Rule 68 offer because it did not fully and completely resolve the Association's claims."). However, the trial court properly denied WRC's motion, because the judgment finally obtained by the Association was more favorable than WRC's offer of judgment.

On April 29, 1997, subsequent to the summary judgment proceedings but before trial, WRC tendered an offer of judgment to the Association for $45,000, "inclusive of all costs incurred to date, for all damages, past, present, and future, including all repair and maintenance costs[.]." WRC stated that its

offer was tendered pursuant to HRCP Rule 68.[3] WRC further indicated that

> this offer of judgment is made to resolve the lawsuit *without any admission* by [WRC] that the Order Granting [the Association's] Motion for Partial Summary Judgment with respect to [WRC] ... is correct, appropriate, or binding upon [WRC].

(Emphasis added.)

Relying on *Crown Properties, Inc. v. Financial Sec. Life Ins. Co.*, 6 Haw.App. 105, 712 P.2d 504 (1985), the majority held that WRC's offer was not a valid HRCP Rule offer, because it did not fully and completely resolve the Association's claims. *See* majority opinion at 120–121, 58 P.3d 631–632. In *Crown Properties*, sublessor brought an action against sublessees for (1) a declaratory judgment terminating the sublease; (2) a writ of possession; and (3) a monetary judgment for occupancy of sublessor's property after termination of the sublease. 6 Haw. App. at 107, 712 P.2d at 506. Sublessees offered a sum of money to resolve the issue of past-due rent owed, but the offer did not address plaintiff sublessor's claims seeking a declaratory judgment and a writ of possession. *Id.* at 107, 110, 113–14, 712 P.2d at 506, 508, 510.[4] The ICA stated:

> To qualify as a Rule 68 offer, the offer must be such that a judgment in the words of the offer will fully and completely decide the claim or claims toward which the offer is directed.

*Id.* at 113, 712 P.2d at 510. The ICA went on to hold that the offer was "insufficient and incomplete" to qualify as a HRCP Rule 68 offer of judgment. *Id.* at 113, 712 P.2d at 510. The ICA reasoned that:

> A judgment requiring [the sublessees] to pay [sublessor] $265,000 inclusive of accrued costs and attorney fees would not decide and dispose of any portion or all of [sublessor's] claim against [the sublessees]. The continued existence of the sublease would still be in dispute. [Sublessees] would still be occupying the premises and incurring additional lease rent obligations. *We would not know what specific obligations the $265,000 covers.* Such a judgment would be no more than an advance payment pending a decision on the merits of the claim.
>
> Since the ... offer was imprecise, it did not qualify as a Rule 68 or a non-Rule 68 offer of judgment, and its acceptance did not result in a binding agreement.

*Id.* at 113–14, 712 P.2d at 510 (emphasis added).

In light of *Crown Properties*, the majority in the instant case held that the WRC's offer is invalid because it "excluded the Association's claim for declaratory judgment seeking to establish ownership of the drainpipes, reserving to WRC the right to further challenge the trial court's order granting the Association's motion for partial summary judgment on the issue of who owned the drain pipes." Majority opinion at 56. The majority's reliance on *Crown Properties* is misplaced.

Although WRC's offer excluded any admission as to the propriety of the trial court's

---

**3.** HRCP Rule 68 states in pertinent part:

At any time more than 10 days before the trial begins, any party may serve upon any adverse party an offer of settlement or an offer to allow judgment to be taken against either party for the money or property or to the effect specified in the offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall, in accordance with the agreement, enter an order of dismissal or a judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. *If the judgment finally obtained by the offeree is not more favorable than the*

*offer, the offeree must pay the costs incurred after the making of the offer.*
(Emphasis added.)

**4.** In *Crown Properties*, defendants' offer of judgment stated in relevant part:

COME NOW, UNITED INDEPENDENT INSURANCE AGENCIES, INC. ("UIIA") and FINANCIAL SECURITY INSURANCE COMPANY, LTD. ("FSIC") pursuant to Rule 68 of the Hawai'i Rules of Civil Procedure and hereby offer a Judgment in favor of CROWN PROPERTIES, INC. ("CROWN") in the sum of $265,000 (TWO HUNDRED SIXTY FIVE THOUSAND AND 00/100 DOLLARS) inclusive of accrued costs and attorneys's [sic] fees.
6 Haw.App. at 109, 712 P.2d at 507.

granting of the Association's Motion for Summary Judgment, as between the Association and WRC, such offer was "sufficient and complete." Acceptance of the terms of WRC's offer effectively "resolves [the Association's] lawsuit" against WRC, because the implicit purpose of WRC's offer is to serve as consideration for the Association's release of its right to hold WRC liable for "all damages, *past, present, and future,* including all repair and maintenance costs." In other words, although WRC is not admitting that the trial court is correct in granting the Association's motion for partial summary judgment, acceptance of the terms of the offer, in effect, completely disposes of all of the Association's past, present, and future claims against WRC.[5]

Having determined that the offer, by its own terms, would have fully and completely resolved the Association's claims, I now turn to the more crucial issue: Was the judgment finally obtained by the Association (offeree) more favorable than the offer? By utilizing the analytical approach that I set forth below, I conclude that the judgment obtained by the Association is more favorable than the $45,000 offer of judgment made by WRC, such that WRC is not entitled to costs incurred after the making of its December 30, 1997 offer.

This court has not addressed the proper approach in determining whether "the judgment finally obtained by the offeree is not more favorable than the offer," particularly where the offer or judgment includes nonmonetary relief, for purposes of HRCP Rule 68. Thus, I take this opportunity to do so.

In interpreting HRCP Rule 68, this court has examined the treatment of the Federal Rules of Civil Procedure Rule 68, which is identical. *See Canalez v. Bob's Appliance Service Center, Inc.,* 89 Hawai'i 292, 308, 972 P.2d 295, 311, *amended by,* 1999 Haw. LEXIS 99 (Haw. Feb. 22, 1999); *Collins v. South Seas Jeep Eagle,* 87 Hawai'i 86, 88–90, 952 P.2d 374, 376–78 (1997). Thus, "the interpretation of [Rule 68] by federal courts is highly persuasive." *Canalez,* 89 Hawai'i at 306, 972 P.2d at 309 (quoting *Shaw v. North American Title Co.,* 76 Hawai'i 323, 326, 876 P.2d 1291, 1294 (1994) (citations omitted)) (internal quotation marks omitted).

This court has explained that the rule was "intended to encourage settlements and avoid protracted litigation." *Collins,* 87 Hawai'i at 88, 952 P.2d at 376 (quoting 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure: Civil 2d* § 3001 (2d ed.1997)) (internal quotation marks omitted).

Of course, deciding whether the judgment is more favorable than the offer in a case where both the judgment and offer are for money, is not complicated. In that situation, the trial court can readily compare the two amounts. Another simple scenario is where all of the elements of either the offer or the judgment are included in the other. There, the court can effortlessly determine whether the offer or judgment is more favorable by ignoring the common elements.[6] *See* 12 Wright, § 3006.1 at 122 (citing cases); 13 James Wm. Moore et al., *Moore's Federal Practice* § 68.07 at 38–39 (3d ed.2000).

But there are other cases where the comparison is not so simple. Determining whether the offer or judgment is more favorable becomes "intrinsically more difficult where one or both involves nonmonetary re-

---

5. *Crown Properties* is distinguishable from the instant case in that the offer involved in *Crown Properties,* as the ICA correctly indicated, was "imprecise," because acceptance of its terms "would not decide and dispose any portion or all of [sublessor's] claim against [the sublessees]." *Id.* at 113–14, 712 P.2d at 510. This is due to the broad language employed by the drafters of the offer which failed to specify what portion of sublessor's claim the offer was intended to address. In contrast, the offer involved in the instant case was "precise" enough for the purpose of a Rule 68 analysis. WRC's offer sought to release itself from all liabilities arising from "all damages, past, present, and future," regard-

less of whether WRC owned the easements or not. Whereas the offer in *Crown Properties* was written in general terms without indicating which claim or claims the offer was meant to address, the offer in the instant case expressly provided that it was meant to relieve WRC of *all* liabilities, past, present, and future.

6. A judgment that is identical to the Rule 68 offer is not more favorable. Thus, Rule 68 applies. Such case may occur in dealing with either monetary or equitable relief. *See* 12 Wright § 3006.1 at 123 (citing cases).

lief. In particular, it is difficult to compare monetary relief with nonmonetary relief...." Wright § 3006.1 at 127. Justice Brennan described this problem more concretely: "[I]f a plaintiff recovers less money than was offered before trial but obtains potentially far-reaching injunctive or declaratory relief, it is altogether unclear how the Court intends judges to go about quantifying the 'value' of the plaintiff's success." *Marek v. Chesny*, 473 U.S. 1, 32, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985) (Brennan, J., dissenting).

Because of these problems in comparing offers and judgments where nonpecuniary relief is involved, there is "no widely accepted objective method" and "no sharply articulated approach has emerged in the cases to date." Moore § 68.07[3] at 41 (citation omitted). Instead, "it seems fair to say that judges deal with these problems on a case-by-case basis." *Id.; see also* Wright § 3006.1 at 128 ("Probably no clear rules can guide that decision [where nonmonetary elements are involved].").

But the difficulty of comparing an offer and judgment that include nonmonetary elements does not mean that Rule 68 should not be applied to such cases. Indeed, the language of the rule is mandatory, not discretionary. No exceptions are described.[7] In addition, the rule's application to cases in equity furthers its underlying objective. "Despite the uncertainties of nonpecuniary comparison, Rule 68 offers cause both parties to focus on what settlement terms would be acceptable to them." Thomas L. Cubbage III, Note, "Federal Rule 68 Offers of Judgment and Equitable Relief: Where Angels Fear to Tread," 70 *Tex. L.Rev.* 465, 474 (1991).

For these reasons, federal courts have overwhelmingly applied Rule 68 to cases dealing with equitable relief. *See,* e.g., *Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438, 442 (9th Cir.1982) (considering offer of judg-

ment consenting to an injunction against disclosure of information); *Domanski v. Funtime, Inc.*, 149 F.R.D. 556, 558 (N.D.Ohio 1993) ("[P]ermanent injunctive relief, though admittedly difficult to quantify, adds considerable value to the 'judgment finally obtained' by [plaintiff] when compared to the judgment offered by [defendant]."); *Lish v. Harper's Magazine Found.*, 148 F.R.D. 516, 520 (S.D.N.Y.1993) (considering judgment's grant of authorial right to control publication and judicial determination of copyright violation); *Lightfoot v. Walker*, 619 F.Supp. 1481, 1485–86 (S.D.Ill.1985) (considering offer of judgment consenting to prison health care reform); *Association for Retarded Citizens v. Olson*, 561 F.Supp. 495, 499 (D.N.D.1982), *modified on other grounds*, 713 F.2d 1384 (8th Cir.1983) (considering offer of judgment consenting to state mental health facility reform); *Mr. Hanger, Inc. v. Cut Rate Plastic Hangers, Inc.*, 63 F.R.D. 607, 610–11 (E.D.N.Y.1974) (considering offer of judgment promising to cease alleged patent infringement). *But see Real v. The Continental Group, Inc.*, 653 F.Supp. 736, 739 (N.D.Cal.1987) ("The imprecision in making such an evaluation for the purposes of the *Marek* comparison persuades me that, without more direction, the better course is to compare monetary awards only."); *Gay v. Waiters' & Dairy Lunchmen's Union Local, No. 30*, 86 F.R.D. 500 (N.D.Cal.1980) (holding that Rule 68 should not be applied to class action suit because threat of making class representative liable would create unacceptable conflict of interests between representative and class). As the United States District Court for the District of Massachusetts observed, "Financial compensation ... is not the 'be all and end all.'" *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 749 F.Supp. 331, 333 (D.Mass.1990), *aff'd in part and rev'd in part on other grounds*, 940 F.2d 744 (1st Cir.1991) (considering benefits

---

**7.** The drafters of Rule 68 appear to have focused only on the easier case where the offer and judgment could be quickly and accurately compared: generally where two monetary figures are involved. The Fifth Circuit Court of Appeals noted that "Rule 68 is a mandatory rule designed to operate automatically by a comparison of two clearly defined figures." *Johnston v. Penrod*

*Drilling Co.*, 803 F.2d 867, 870 (5th Cir.1986); *see also* Thomas L. Cubbage III, Note, "Federal Rule 68 Offers of Judgment and Equitable Relief: Where Angels Fear to Tread," 70 *Tex. L. Rev.* 465, 475 (1991) (describing failure of drafters to consider whether benefits of application of Rule 68 to equitable relief outweigh difficulties).

from judgement's retention of franchises for three years).

Thus, given both the necessity and difficulty of considering non-pecuniary aspects for purposes of Rule 68, the court must establish a framework to minimize, if not eliminate, Justice Brennan's concern:

> Although courts must ... evaluate the "value" of nonpecuniary relief before deciding whether the "judgment" was "more favorable than the offer" within the meaning of Rule 68, the uncertainty in making such assessments surely will add pressures on a plaintiff to settle his suit even if by doing so he abandons an opportunity to obtain potentially far-reaching nonmonetary relief—a discouraging incentive entirely at odds with Congress' intent.

*Marek*, 473 U.S. at 33 n. 48, 105 S.Ct. 3012 (citations omitted).

Before describing my proposed approach, I note the flaw of an alternative method— "pure quantification." Some scholars have suggested that courts should attempt to quantify, usually in monetary terms, all equitable relief. *See, e.g.,* Roy D. Simon, Jr., "The New Meaning of Rule 68: *Marek v. Chensy* and Beyond," 14 *N.Y.U. Rev. L. & Soc. Change* 475, 486–87 (1986); Julie M. Cheslik, Note, "The Proposed Amendment to Federal Rule of Civil Procedure 68: Toughening the Sanctions," 70 *Iowa L.Rev.* 237, 264 (1984). But, though comparing monetary values is easy, monetizing the nonmonetary relief is difficult. The necessary valuation is fraught with oft-hidden subjectivity and assumptions. *See generally* Robert H. Frank, "Why is Cost Benefit Analysis So Controversial?" 29 *J. Legal Stud.* 913 (2000) (detailing valuation problems); *see also* Stephen G. Breyer et al., *Administrative Law and Regulatory Policy* 181 (4th ed.1999) (questioning valuation and appropriateness of willingness to pay).

Though mathematical in form, the pure quantification method is not mathematical in accuracy. Quantifying that which defies quantification is a prickly problem. For example, placing a monetary value on the "re-quired immediate alleviation of overcrowded conditions at the central [mental health] institutions," *Association for Retarded Citizens*, 561 F.Supp. at 498, is formidable—if not impossible. It is difficult not only to define such subjective terms as "immediate," "alleviate," and "overcrowded," [8] but also to value to the plaintiff in monetary terms such benefits. Indeed, as noted above, even Justice Brennan questioned the ability—or even capability—of courts "quantifying the 'value' of the plaintiff's [equitable relief]." *Marek*, 473 U.S. at 32, 105 S.Ct. 3012. The additional problem with pure quantification is that it provides a false sense of accuracy. Though dollar amounts are easy to compare, they are meaningless if not based on sound judgment. The pure quantification values everything— from safer working condition for a single factory worker to a permanent injunction against polluting the ocean—on the single metric of aggregated private willingness to pay. Preciseness must not be confused with accuracy.

In the different, yet instructive, context of cost-benefit analysis (CBA), Professor Cass Sunstein reveals not only the problems with pure quantification with respect to Rule 68, but also alludes to the better approach:

> The real problem with any form of conventional CBA is that it is obtuse. CBA is obtuse because it tries to measure diverse social goods along the same metric. Suppose, for example, that we are told that the "cost" of a certain occupational safety regulation is $1 million, and that the "benefit" is $1.2 million. To make a sensible evaluation, we need to know a great deal more. To what do these numbers refer? Do they include greater unemployment, higher inflation, and the scaled-back production of important goods? Do they mean more poverty? At least in principle, it would be much better to have a highly disaggregated system for assessing the qualitatively different effects of regulatory impositions. People should be allowed to see those diverse effects for themselves and to make judgments based on an understanding of

---

**8.** The "analytical" approach that I propose this court to adopt would adequately address this issue by examining at least three relevant factors with respect to both the offer and judgment: (1) timeliness; (2) comprehensiveness; and (3) specificity.

the qualitative differences. If all of the relevant goods are aligned along a single metric, they become less visible, or perhaps invisible.

Cass R. Sunstein, "Incommensurability and Valuation in Law," 92 *Mich. L.Rev.* 779, 841 (1994).

A superior alternative to the pure quantification method—which this court ought to adopt—is the "analytical" approach:

> Rather than trying to quantify nonpecuniary relief, courts applying the analytical method would analyze all of the elements of offers and judgments, including monetary and nonmonetary awards. Judges would identify and weigh strengths and weaknesses of the offers and final judgments. An analytical approach would prompt courts to view situations more holistically and to articulate their comparisons more comprehensively.

Cubbage at 482 (citations omitted). Many federal courts have already employed such approach to some extent. *See, e.g., Spencer v. General Electric Co.,* 894 F.2d 651 (4th Cir.1990); *Garrity v. Sununu,* 752 F.2d 727 (1st Cir.1984); *Lightfoot,* 619 F.Supp. at 1481; *Association for Retarded Citizens,* 561 F.Supp. at 495. This analysis should not be unduly difficult because the judges would already be familiar with the contents and merits of the judgment they themselves have issued.[9]

Specifically, in evaluating the favorableness of equitable relief, courts should consider the following three factors, in addition to any other factors the court deems relevant:

1. Timeliness
2. Comprehensiveness
3. Specificity

*See Marek,* 473 U.S. at 1, 105 S.Ct. 3012 (timeliness); *Garrity,* 752 F.2d at 731 (timeliness and specificity); *Association for Retarded Citizens,* 561 F.Supp. at 498 (comprehensiveness); *Lightfoot,* 619 F.Supp. at 1486 (comprehensiveness); *see also* Cubbage at 496–99.

First, courts should consider timeliness of relief. In *Marek,* the United States Supreme Court pointed out that civil rights plaintiffs would benefit from settlements encouraged by Rule 68 because "settlement will provide them with compensation at an earlier date without the burdens, stress, and time of litigation." *Marek,* 473 U.S. at 10, 105 S.Ct. 3012.

Second, courts should examine whether the relief provides a remedy for all primary issues raised. In *Association for Retarded Citizens,* the court compared the offer with the final judgment and found that the former failed to meet the needs of four "critical areas." 561 F.Supp. at 498. *See also Lightfoot,* 619 F.Supp. at 1486 (finding that offer failed to include "essential" elements). Thus, the courts should undertake a side-by-side comparison of the material elements of both the offer and the judgment. Although this court should reject the pure quantification approach as described above, this does not mean that my proposed approach precludes *per se* the use of quantification in helping courts evaluate equitable relief that is susceptible to easy and accurate monetization. Quantification is *one* tool to be used by the courts—not the *only* tool. Thus, the courts are not required to (1) place a monetary value on all equitable relief or (2) compare only such monetary values in making its Rule 68 determination. *See, e.g., Domanski,* 149 F.R.D. at 558 ("This Court finds that the judgment obtained by Domanski was more favorable than Funtime's offer because it included permanent injunctive relief that was not in the offer, which only provided for a monetary judgment. This permanent injunctive relief, though admittedly difficult to quantify, adds considerable value to the 'judgment finally obtained' by Domanski when compared to the judgment offered by Funtime."). For example, an offer of reinstatement to a job for one year can be readily valuated by examining the annual salary and any additional benefits. But, if the court determines that there are nonpecuniary benefits to reinstatement, it should consider them. The analytical, as opposed to the pure

9. Although some may fear that the trial court judges will be predisposed to believe that their final judgments are more favorable than the offers, such fear should be alleviated by requiring the judges to consider explicitly the three factors, discussed *infra*.

quantitative, approach provides the necessary flexibility for the courts to faithfully apply Rule 68 in fulfilling its purposes: encouraging settlements and avoid protracted litigation without unfairly chilling a plaintiff's ability to pursue his or her claims in court. *See Marek,* 473 U.S. at 33 n. 48, 105 S.Ct. 3012; *Chestnut Hill Gulf, Inc.,* 749 F.Supp. at 333; *Collins,* 87 Hawai'i at 88, 952 P.2d at 376. Whereas the pure quantification approach restrains the courts due to its rigid requirement of applying quantification in all cases, the analytical approach frees the courts to use quantification in only those cases that make sense.

Third, the courts should consider the specificity of the offer. A vague offer impedes the plaintiff in ascertaining the actual benefits. In fact, open-ended terms may even nullify the purported benefits. In *Collins,* we emphasized the significance of specificity:

> When a defending party chooses to couch its settlement offer in terms of a Rule 68 offer of judgment, it is taking advantage of certain tactical advantages not available to the normal offeror.... Unlike the offeree of an ordinary contract, the Rule 68 offeree is bound by an offer of judgment whether it is accepted or not. Because of the difficulty of the choice that an offer of judgment requires a claimant to make, it is essential that he be able to discern with certainty what the precise terms of the offer are. When an offer of judgment uses terms of art, a claimant must be allowed to make his acceptance decision based on the interpretation those terms are commonly given. To allow a Rule 68 offeror to inject ambiguities into its offer after the fact would be tantamount to requiring the offeree to guess what meaning a court will give to the terms of that offer before deciding whether to accept it or not.

87 Hawai'i at 90, 952 P.2d at 378 (quoting *Said v. Virginia Commonwealth Univ.,* 130 F.R.D. 60, 63 (E.D.Va.1990)). Given this danger, the ICA criticized an offer for its imprecision and lack of specificity. *See Crown Properties,* 6 Haw.App. at 114, 712 P.2d at 510; *see also Garrity,* 752 F.2d at 732

(agreeing with trial court that motion for costs should be rejected because, *inter alia,* offer was too "indefinite and ambiguous"). In interpreting ambiguous terms of an offer, courts should not only construe them against the defendant who drafted the offer, *see Collins,* 87 Hawai'i at 90, 952 P.2d at 378 (quoting Wright § 3002), but may also consider whether the defendant made the offer in good faith, *see Garrity,* 752 F.2d at 733 ("Such footdragging [by defendants] would tend to weaken the credibility of the offer, since its value depended on how much defendants could be relied upon to develop and implement an effective plan."); Cubbage at 500 (discussing defendant's cooperativeness). As a result, offers of judgment, as well as final judgments, should be as specific as possible.

The defendant bears the burden in demonstrating that the offer of judgment is more favorable than the judgment. Admittedly, the wording of the rule indicates that the cost-shifting consequence applies unless the judgment is more favorable, thereby suggesting that the plaintiff bears the burden. Nevertheless, Wright § 3006.1 points out that:

> Rule 68 is actually a tool for defendant to use, and defendant alone determines the provisions of the offer. Since defendant has drafted those provisions, the courts generally interpret the offer against defendant. Consistent with that, the burden should be on defendant to demonstrate that those provisions are in fact more favorable than what plaintiff obtained by judgment.

*Id.* at 128–29. Similarly, we have observed that "[b]ecause of the special considerations in a Rule 68 offer, 'courts may be particularly prone to interpret the language of a Rule 68 offer against the defendant that drafted it.'" *Collins,* 87 Hawai'i at 90, 952 P.2d at 378 (quoting Wright § 3002). In other words, where it is not clear that the objectives of the rule—promoting settlements and avoiding protracted litigation, *see id.* at 88, 952 P.2d at 376—will be satisfied, trial courts should not grant a defendant's motion for costs,[10] *see*

---

10. Indeed, Cubbage recommends that the plaintiff be given the benefit of the doubt:

> Any plaintiff faced with an offer of judgment runs a risk in rejecting it, and such a plaintiff

Cubbage at 503 (citing Simon at 486 (arguing that when court cannot readily make comparison between relief offered and relief obtained, Rule 68 should not apply if defendant cannot prove that offer was more favorable than judgment), and John P. Woods, "For Every Weapon, A Counterweapon: The Revival of Rule 68," 14 *Fordham Urb. L.J.* 283, 296 (1986) (asserting that if meaningful comparison is impossible, fairness requires finding that judgment exceeds offer)).

The courts should also allow the plaintiff to demonstrate the favorableness of the judgment over the offer. In *Chestnut Hill Gulf, Inc.*, the United States District Court for the District of Massachusetts considered the fact that plaintiff's "belief that [defendants] had acted improperly was vindicated by the jury's finding of bad faith." 749 F.Supp. at 333. Thus, the court concluded that "Rule 68 was not intended to preclude parties from having their day in court where more could be gained from litigating a matter than from accepting a settlement." *Id.* Of course, this does not mean that trial courts must take the plaintiff's purported valuation at face value. Instead, it should assist the courts in more accurately comparing the offer and judgment.

Finally, trial courts should explain their decisions by detailing their analyses of these factors. In this way, trial courts should identify the factors considered and describe their subsequent evaluations, in addition to specifying any assumptions made. Such guideline is rooted in the principle of transparency, which leads to three benefits. First, the parties involved will better understand courts' decisions. Second, a clear statement promotes disciplined and objective decision-making. Third, it facilitates review on appeal by allowing the appellate courts to more easily identify an abuse of discretion.

Here, WRC's offer of judgment was completely monetary: $45,000. In contrast, the final judgment included both monetary and equitable elements. The monetary aspect

must decide what to do based on a prediction of the outcome at trial. When the offer contains nonpecuniary features, however, the plaintiff must also estimate how the court will evaluate those features. If the offer and the later judgment turn out, on the basis of analy-

totaled $17,684.57—$16,644.53 for the 54″ drainage system and $1,040.04 for the 24″ drainage system. The equitable aspect was the declaratory judgment by the court that WRC is an owner of the easements and, accordingly, has a duty to maintain the easements in the future. With respect to this element, I apply the analytical approach delineated above to determine whether the trial court abused its discretion in denying WRC's motion for costs.

First, timeliness of relief is not a major factor here because there are no significant interim damages accruing between the time that the offer was made and the judgment was ordered.

Second, a side-by-side comparison of the offer and the judgment reveals that the latter is significantly more comprehensive in redressing the Association's grievances. While the offer roundaboutly rejects ownership of easements, the judgment expressly declares WRC's ownership. WRC posits that the "declaratory judgment of the percentage of liability has no independent significance" other than liability for repair and maintenance costs. But this is not so. For example, an owner of an easement not only has the duty to keep it in repair, but also is liable in damages for injuries caused by failure to keep the easement in repair. *See Levy v. Kimball*, 50 Haw. 497, 498–99, 443 P.2d 142, 144 (1968) (cases cited); *Thompson on Real Property* § 60.05(b) at 464. Thus, WRC's offer of judgment is not as comprehensive as the final judgment. Moreover, the offer covers only a one-time repair, while the judgment requires a perpetual obligation of WRC to repair. In addition, this is a case where quantification—as one tool, rather than the only tool—may help in evaluating the equitable relief of the judgment. WRC claims that because it is responsible only for "permanent repair" amounting to $17,684.57, such "permanent" repair would discharge its duty to maintain its easements. But perma-

sis—alike in effect if not identical in elements—the plaintiff should be given some credit for having made good estimates and a reasonable choice.

Cubbage at 253.

nence of a drainage pipe is different from perpetuity of an easement.[11] In other words, the declaratory judgment by the court that WRC is an owner of the easements and, accordingly, has a duty to maintain the easements in the future will likely be more favorable than a one-time payment of $45,000. In fact, this one incident of rupture on the 54″ drainage pipe cost about one-third of the amount offered by WRC for both systems. Future ruptures are inevitable. Moreover, the purportedly "permanent" repair does not account for risks posed by unexpected—though unavoidable—events, such as ground shifting and natural disasters. Thus, the comparison between the offer and the judgment indicates that the latter is more comprehensive than the former.

Third, the offer and judgment are sufficiently specific to ascertain their benefits.

Thus, WRC, as the defendant, has failed to bear its burden that the offer of judgment is more favorable than the judgment. As a result, though the trial court neglected to provide a clear explanation of its decision, its denial of WRC's motion for costs is not an abuse of discretion.

## III. CONCLUSION

Based on the foregoing, I would hold that the trial court did not err: (1) in ruling that both WRC and the County own easements in the drainage pipes and are, therefore, responsible for the maintenance and repair of the easements and (2) in denying WRC's motion for costs pursuant to HRCP Rule 68. I disagree with the majority's conclusions that (1) WRC owns implied easements and (2) WRC's offer was incomplete. I believe that WRC's offer was complete and valid, but it was still less favorable than the judgment. In all other respects, I agree with the majority.

---

11. Although there is evidence that the "permanent" repairs to the drainage systems would extend their "life equivalent to the life of a concrete structure," Exhibit J–121, which appears to be a substantial amount of time; this remains far different from easements, which are interests in land lasting in perpetuity, *see S. Utsunomiya Enters. v. Moomuku Country Club*, 75 Haw. 480, 502, 866 P.2d 951, 963 (1994).