**Electronically Filed
Intermediate Court of Appeals
CAAP-22-0000473
30-JUL-2025
07:51 AM
Dkt. 77 SO**

NO. CAAP-22-0000473

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

HAIKU SPRINGS LAND DEVELOPMENT INITIATIVE LLC,
a Hawaii Limited Liability Company;
its Manager, JEFFREY BRONFMAN; and its Member
BRONFMAN FAMILY INVESTMENT PARTNERSHIP LLP,
a New Mexico Limited Liability Partnership;
AURORA INVESTMENTS CORPORATION, a Texas Corporation,
Plaintiffs/Claimants-Appellants, v.
MARK FRANCIS SHEEHAN, Individually and as Trustee of the
Mark Francis Sheehan Revocable Living Trust
dated March 14, 1988, Defendant/Respondent-Appellee.

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(S.P. NO. 1CSP-22-0000020)

SUMMARY DISPOSITION ORDER
(By: Nakasone, Chief Judge, McCullen and Guidry, JJ.)

Plaintiffs/Claimants-Appellants **Haiku Springs** Land

Development Initiative LLC; its manager, Jeffrey Bronfman; its

member, Bronfman Family Investment Partnership LLP; and Aurora

Investments Corporation (collectively, **Bronfman**) appeal from the

Circuit Court of the First Circuit's July 18, 2022 order granting Defendant/Respondent-Appellee Mark Francis **Sheehan**'s motion to confirm the final arbitration decision and award.[1]

Bronfman raises three points of error contending the circuit court erred in failing to (1) vacate the arbitration award, (2) hold an evidentiary hearing, and (3) render findings and conclusions.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the issues raised and the arguments advanced, we resolve the points of error as discussed below and affirm.

Bronfman and Sheehan met in 2010. Sheehan owned two parcels of land on Maui: Lots 173 and 174. Bronfman expressed interest in purchasing Lot 173 outright[2] and gradually acquiring Lot 174; to this end, Bronfman and Sheehan entered into several memoranda of understanding and agreement:

**2011 Planting MOA**

On April 29, 2011, the parties entered into a Memorandum of Agreement in which Bronfman, as president of both the Aurora Foundation and O Centro Espirita Benficente União Do

---

[1] The Honorable Gary W.B. Chang presided.

[2] Bronfman purchased Lot 173 from Sheehan in 2011.

Vegetal (**UDV**),[3] agreed to pay Sheehan $1,000.00 per month for thirty-six months for the right to plant ceremonial plants "of fundamental religious importance to the UDV" on Lot 174 (**2011 Planting MOA**).

### 2011 MOA and RFR

Also on April 29, 2011, the parties entered into a Memorandum of Agreement and Right of First Refusal providing for Lot 174's disposition (**2011 MOA and RFR**). Sheehan would "make parcel 174 his primary residence for at least two years" during which he would "execute a CPR (condominium property regime) separating" out half an acre from Lot 174. If Sheehan needed to sell Lot 174's remaining ten acres, Bronfman had the right of first refusal.

### 2012 Acquisition MOU

On August 1, 2012, Bronfman and Sheehan (on behalf of themselves and their wives) entered into a Memorandum of Understanding, which set forth a scheme by which Bronfman would "acquire the total property (Lot 174) over time" (**2012 Acquisition MOU**). (Emphasis added.) Bronfman and Sheehan

---

[3] The Aurora Foundation is a tax-exempt public charity; its purpose is to support "projects that embody strategic efforts for the preservation and protection of planetary ecosystems as well as efforts that secure the perpetuation and practice of indigenous cultures and ancient religious, spiritual, and ceremonial traditions." (Formatting altered.)

UDV is a "federally recognized church (religious organization) [that] utilizes a species of tropical vine (*Banisteriopsis caapi*) and a leaf bearing tree (*Psychotria viridis*) to prepare a sacrament for its religious ceremonial purposes. The plants are considered to be sacred, and of inestimable value, by the adherents of the UDV religion."

agreed to "establish a limited liability company (LLC)" to which Sheehan would contribute his ownership in Lot 174, "valued at $2,100,000." Sheehan would take half an acre, valued at $100,000.00, sometime during the life of the LLC. And Bronfman would initially contribute $250,000.00 in cash to the LLC. The LLC would "own full title to the land with [Sheehan] initially owning 88.095% of the LLC (worth $1,850,000) and [Bronfman] owning 11.905% (worth $250,000)."

With the LLC holding title to Lot 174, Bronfman agreed to pay Sheehan $9,722.25 per month; each payment would increase Bronfman's share in the LLC and reduce Sheehan's share until Bronfman had "full ownership of the LLC and with it [Lot 174] which [would] be the company's sole asset after 15 years, when the final payment of $9722.25 [would] be made."

### 2012 Operating Agreement

On December 27, 2012, Sheehan quitclaimed title to Lot 174 to Haiku Springs.[4]

Two days later, Bronfman and Sheehan formed Haiku Springs, the LLC alluded to in the 2012 Acquisition MOU, by entering into the "Operating Agreement for Haiku Springs Land Development Initiative LLC" (**Operating Agreement** or **OA**).[5] In its

---

[4]   There are discrepancies in the deed, but neither Bronfman nor Sheehan dispute that Sheehan transferred ownership of Lot 174 to Haiku Springs via quitclaim deed.

[5]   The copies of the Operating Agreement in the record are unsigned.

"Complete Agreement" provision, the Operating Agreement expressly stated it "replace[d] and supersede[d] all prior written and oral agreements or statements[.]"

The Operating Agreement again memorialized Bronfman and Sheehan's intentions "to use the Company as a vehicle to transfer the Real Property from Mark Sheehan to Jeffrey Bronfman, over time." (Emphasis added.) It reiterated that Bronfman would "make Capital Contributions to the Company, and the Company is to use those same Capital Contributions to redeem Mark Sheehan's Membership Interests, over time." (Emphasis added.) It did not, however, specify the frequency or amount of these capital contributions.

### 2013 Clarification MOA

On October 24, 2013, Bronfman and Sheehan entered into a Memorandum of Agreement and Assignment of Interests (**2013 Clarification MOA**). This agreement referenced — and appended — the 2011 MOA and RFR and the 2012 Acquisition MOU, and explained that "Sheehan's interest in the property referenced in the April 2011 agreement was to be transferred to" Haiku Springs:

> **Memorandum of Agreement**
> **and Assignment of Interests**
>
> In a Memorandum of Agreement ("MOA") between Jeffrey Bronfman, Mark Sheehan, and Aurora Foundation, dated April 29, 2011, certain agreements and responsibilities related to plants "considered to be sacred and of inestimable value, by the adherents of the UDV religion" were codified. (see Appendix A in attachment).

5

> Under a separate agreement ("Memorandum Of Understanding" or "MOU") between Jeffrey Bronfman and Mark Sheehan, dated August 11, 2012, <u>Mark Sheehan's interest in the property referenced in the April 2011 agreement was to be transferred to a new limited liability company</u> (The Haiku Springs Land Development Initiative LLC or "The LLC"). (See Appendix B in attachment.)
>
> This transfer of ownership interest was realized by a Quit Claim Deed on [December 27, 2012] (See Appendix C in attachment.)

(Emphasis added.)

The 2013 Clarification MOA then clarified "the current and existing agreement" by stating, inter alia, that the agreements "as delineated in the MOA" pass to Haiku Springs:

> For the soul [sic] objective of now <u>clarifying the current and existing agreement between the parties</u> (as modified by the actions described herein):
>
> (1)  As of January 1, 2013, the payment responsibilities of the Aurora Foundation, defined under the April 29, 2011 MOA are now to be paid to the new land owner – the Haiku Springs Land Development Initiative LLC. As previously defined this contractual arrangement will continue through the end of May 2014.
>
> (2)  <u>The agreements between Mark Sheehan and Jeffrey Bronfman, as delineated in the MOA, pass to the LLC</u> for whom Mark and Jeffrey are both member/partners.

(Emphases added.)

For over seven years following the execution of the Operating Agreement, Bronfman paid $9,722.25 monthly to Sheehan as described in the 2012 Acquisition MOU.  Soon thereafter, Bronfman informed Sheehan "he wanted to sell the ten and a half acre Lot 174, windup [Haiku Springs] and distribute the net proceeds according to their respective membership interests."

Sheehan did not want to move forward with Haiku Springs' dissolution.

In October 2020, Bronfman stopped making the $9,722.25 monthly payments. As a result, Sheehan filed a demand and submission for arbitration with Dispute Prevention and Resolution, Inc. pursuant to section 11.8 of the Operating Agreement.

The arbitration panel, as relevant to this appeal, (1) required Bronfman to pay "$145,833.45 ($9722.23 x 15 months)" for past due payments and to resume the "$9,722 monthly payments"; (2) awarded Sheehan the half-acre lot and allotted roughly one year within which he could convert it into a CPR; and (3) ordered Bronfman to pay "$135,477.58 for reasonable attorney fees and costs for this arbitration."

Bronfman moved the circuit court to vacate the Final Arbitration Decision and Award, arguing the panel exceeded its powers "by basing their Decision and Award on prior agreements or statements" in spite of the Operating Agreement's Complete Agreement provision. After hearing arguments, the circuit court denied Bronfman's motion explaining it was "unable to conclude that the arbitrators exceeded their authority" based on "this limited record[.]" Sheehan moved to confirm the award, which was granted.

7

**(1)** Bronfman's first point of error essentially contends the circuit court was required to vacate the award under Hawaiʻi Revised Statutes (**HRS**) § 658A-23(a)(4) (2016), because the panel exceeded its powers by altering material terms of the Operating Agreement. Bronfman argues the arbitration panel "altered and ignored" material terms of the Operating Agreement when it ordered the "$9,722 monthly payments" to resume with back payments and allowed Sheehan to attempt to obtain a CPR.

HRS § 658A-23(a)(4) requires courts to vacate arbitration awards upon motion if "[a]n arbitrator exceeded the arbitrator's powers[.]" The panel's scope of "authority is determined by agreement of the parties." Kona Vill. Realty, Inc. v. Sunstone Realty Partners, XIV, LLC, 123 Hawaiʻi 476, 477, 236 P.3d 456, 457 (2010) (citation and internal quotation marks omitted). "In determining whether an arbitrator has exceeded his or her authority under the agreement, there should be no second guessing by the court of the arbitrator's interpretation of his or her authority so long as the arbitrator's interpretation could have rested on an interpretation and application of the agreement." In re Hawaiʻi State Tchrs. Ass'n, 140 Hawaiʻi 381, 399, 400 P.3d 582, 600 (2017) (cleaned up).

"Thus, an arbitrator's award is valid when it 'draws its essence' from the arbitration agreement." Tatibouet v. Ellsworth, 99 Hawaiʻi 226, 235, 54 P.3d 397, 406 (2002) (footnote and citation omitted). This standard has been interpreted "to mean that a reviewing court must look to the arbitration clause, the words of the contract, and the conduct of the parties." Id. at 235 n.7, 54 P.3d at 406 n.7.

Appellate courts review "the circuit court's ruling on an arbitration award *de novo*," but are also "mindful that the circuit court's review of arbitral awards must be 'extremely narrow and exceedingly deferential.'" Id. at 233, 54 P.3d at 404 (cleaned up).

Section 11.8, the "Dispute Resolution" provision in the Operating Agreement, applied to "any other dispute, controversy, or claim between the parties arising out of or relating to this Agreement[.]" This section provided that the "arbitration panel has no power to alter, amend, modify, or change any of the terms of this Agreement or to grant any remedy which is either prohibited by the terms of this Agreement or not available in a court of law." Section 11.1, the "Complete Agreement" section of the Operating Agreement, also stated that it was "the complete and exclusive statement of agreement among the Members" and contained an integration provision stating it

9

"replace[d] and supersede[d] all prior written and oral agreements or statements[.]"

The Operating Agreement established Haiku Springs for the express purpose of using it "as a vehicle to transfer the Real Property [(defined as Lot 174)] from Mark Sheehan to Jeffrey Bronfman, <u>over time</u>."  (Emphasis added.)  It "structure[d] that incremental transfer as follows:  Jeffrey Bronfman is to make Capital Contributions to the Company, and the Company is to use those same Capital Contributions to redeem Mark Sheehan's Membership Interests, <u>over time</u>."  (Emphasis added.)

"Alter" means "to change," while "interpret" means "[t]o ascertain the meaning and significance of thoughts expressed in words."  Bryan A. Garner, <u>Garner's Modern American Usage</u> 37 (2d ed. 2003); <u>Interpret</u>, <u>Black's Law Dictionary</u> 977 (12th ed. 2024).

Here, the arbitration panel did not alter the phrase "over time," but rather interpreted it.

The arbitration panel interpreted "over time" as meaning "$9,722 monthly payments" until Sheehan's interest was fully redeemed, which was consistent with Bronfman's behavior in the years following the execution of the Operating Agreement. For the seven-plus years after the Operating Agreement went into effect, Bronfman consistently made the $9,722.25 monthly

10

payments. Bronfman's payments in those seven-plus years show that the arbitration panel's "interpretation could have rested on an interpretation and application of the agreement" as Bronfman appears to have interpreted the Operating Agreement in the same manner. See In re Hawai'i State Tchrs. Ass'n, 140 Hawai'i at 399, 400 P.3d at 600 (cleaned up).

We now turn to the arbitration panel's order granting Sheehan time "to convert the half acre lot he occupies on the upper portion of Lot 174 into a CPR[.]"

Nothing in the Operating Agreement refers to Sheehan obtaining a CPR for half an acre. But section 11.13 allows for amendments if in writing and signed by all members.

The 2013 Clarification MOA was in writing and signed by Sheehan and Bronfman. The 2013 Clarification MOA specifically referenced Sheehan's property interests, stating that under the 2012 Acquisition MOU, "Sheehan's interest in the property referenced in the April 2011 agreement was to be transferred to a new limited liability company," Haiku Springs. The 2013 Clarification MOA then stated, "The agreements between [Sheehan and Bronfman], as delineated in the [2011] MOA [and RFR], pass to the LLC for whom [Sheehan and Bronfman] are both member/partners."

11

Sheehan's interest in the property as explained by the 2011 MOA and RFR included "execut[ing] a CPR (condominium property regime) separating the approximately half acre with the bamboo house by the road from the rest of the valley." Thus, the arbitration panel's award regarding obtaining a CPR for the half acre "could have rested on an interpretation and application of the agreement." See In re Hawai'i State Tchrs. Ass'n, 140 Hawai'i at 399, 400 P.3d at 600.

"Given the broad discretion afforded to arbitrators and the strict limits confining judicial review of arbitration awards," we cannot say the panel exceeded its powers. See id. at 400, 400 P.3d at 601. In turn, the circuit court did not err in denying the motion to vacate and granting the motion to confirm. See id.

**(2)** We address Bronfman's second and third points of error together. Bronfman contends the circuit court "erred by failing to (a) hold an evidentiary hearing . . . or (b) issue findings of fact and conclusions of law[.]" Bronfman makes these contentions in relation to whether the 2013 Clarification MOA modified the Operating Agreement and whether the attorneys' fees were reasonable.

Specifically, Bronfman argues that the circuit court, in ruling on his motion to vacate, "heard argument from counsel but declined to conduct an evidentiary hearing or issue findings

of fact resolving what was a material factual dispute between the parties — *i.e.*, whether the 2013 MOA amended the LLC OA between [him] and Sheehan."[6]  Bronfman also argues that, because the parties disputed the reasonableness of the claimed attorneys' fees "before the Circuit Court on [Bronfman's] Motion to Vacate the Arbitration Award with no finding in the Award, the Circuit Court too should have conducted an evidentiary hearing and issued appropriate findings of fact with respect to the reasonableness of attorneys' fees included in the Award."

Bronfman, however, does not cite to where in the record these proffered errors were raised to the circuit court. See Hawaiʻi Rules of Appellate Procedure Rule 28(b)(4) (providing in part that "[e]ach point shall state . . . where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court" and "[p]oints not presented in accordance with this section will be disregarded").  Our review of the record indicates that neither error was preserved, and these contentions are waived.[7]  Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co., 100 Hawaiʻi

---

[6]  In his argument, Bronfman provides no record citation for this statement.

[7]  With respect to the third point of error challenging the lack of findings and conclusions, it appears Bronfman took a contrary position below, filing an objection to Sheehan's submission of proposed findings and conclusions because the circuit court 'did not articulate any' and '[n]either [the statute] or Court Rules require[d]" such.

97, 107, 58 P.3d 608, 618 (2002) ("Legal issues not raised in the trial court are ordinarily deemed waived on appeal.").

Based on the foregoing, we affirm the circuit court's July 18, 2022 order.

DATED:  Honolulu, Hawai'i, July 30, 2025.

On the briefs:

Gary G. Grimmer,
Ann Correa,
for Plaintiffs/Claimants-
Appellants.

Linda J. Nye,
for Defendant/Respondent-
Appellee.

/s/ Karen T. Nakasone
Chief Judge

/s/ Sonja M.P. McCullen
Associate Judge

/s/ Kimberly T. Guidry
Associate Judge